**MISSION PHARMACAL COMPANY,**
**Plaintiff,**

v.

**VIRTUS PHARMACEUTICALS,**
**LLC, Defendant.**

**Cause No. 5:13–CA–176–OLG.**

United States District Court,
W.D. Texas,
San Antonio Division.

Signed April 28, 2014.

Daniel A. Prati, Charles B. Walker, Jr., Fulbright & Jaworski LLP, Houston, TX, for Plaintiff.

Amanda Hyland, Brett Bartel, Jeffrey R. Kuester, W. Scott Creasman, Taylor English Duma, Atlanta, GA, Daniel A. Rogers, Tuggey, Rosenthal, Pauerstein, Sandoloski & Agather, LLP, Jonathan D. Pauerstein, Rosenthal Pauerstein Sandoloski Agather LLP, San Antonio, TX, for Defendant.

## ORDER ADOPTING REPORT AND RECOMMENDATION

ORLANDO L. GARCIA, District Judge.

On this date came to be considered the Report and Recommendation (docket no. 99) of United States Magistrate Judge Pamela Mathy, in which she recommends the Court DENY Defendant's Motion for

Partial Summary Judgment Regarding Plaintiff's False Advertising and Unfair Competition Claims Under the Lanham Act and Common Law Unfair Competition Claim (docket no. 79).

Defendant filed objections thereto (docket no. 101). When a party objects to a Magistrate Judge's Report and Recommendation, the Court must make a *de novo* determination of those portions of the report or proposed findings or recommendations to which objection is made. *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 646 (5th Cir.1994); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). After conducting an independent review of the entire record, a *de novo* review of the matters raised by Defendant's objections, and the applicable law, this Court concludes the Magistrate Judge's Report and Recommendations should be fully accepted.

Therefore, having considered all of the papers filed in this case, the Magistrate Judge's Report and Recommendation, and the Parties' objections to the report, it is ORDERED the United States Magistrate Judge's Report and Recommendation is ACCEPTED pursuant to 28 U.S.C. § 636(b)(1). Therefore, it is ORDERED that Defendant's Motion for Partial Summary Judgment on Plaintiff's False Advertising and Unfair Competition Claims (docket no. 79) is DENIED.

It is so ORDERED.

## REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE [1]

PAMELA A. MATHY, United States Magistrate Judge.

Pursuant to the order of referral in the above-styled and numbered cause of action to the undersigned United States Magistrate Judge [2] and consistent with the authority vested in United States Magistrate Judges under the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 1(d) of the Local Rules for the Assignment of Duties to United States Magistrate Judges in the Western District of Texas, the following report is submitted for your review and consideration regarding defendant's motion for partial summary judgment as to plaintiff's false advertising and unfair competition claims, filed on February 7, 2014,[3] and related submissions.

---

1. This report deals with a number of submissions by the parties, including exhibits that both sides asked to be sealed. *See* docket no. 80, exhibits 10, 11; text-only order dated Feb. 10, 2014; docket no. 82, exhibits D, E, G–J; docket no. 83; docket no. 87, exhibit D; docket no. 88. In preparing this report, the Court has attempted to avoid or minimize references to protected material. In an abundance of caution, the report is provisionally sealed to afford the parties the opportunity to suggest redactions to the report before it is placed in the public record. To that end, any party wishing to recommend redactions to the report must confer with the opposing party and, within 10 calendar days of the date on which the District Clerk files this report, file an advisory containing a brief explanation of the suggested redactions and attach to that advisory, as a sealed document, a proposed redacted copy of this report. After their conference, if possible, the parties are asked to file a joint advisory and single proposed redacted report. But, if the parties are not able to agree on the nature and scope of any redactions, then the parties may submit separate advisories to briefly explain the suggested redactions, with particular emphasis on proposed redactions on which the parties do not agree, and separate sealed proposed redacted reports for the Court's further review. If no party files such an advisory and proposed redacted report within the time provided, then the District Clerk will file an unsealed version of this report in the public record without further order from the Court.

2. Docket no. 73 (Jan. 6, 2014).

3. Docket no. 79.

## TABLE OF CONTENTS

I. Jurisdiction

II. Summary of Procedural History and Claims

III. Issue

IV. Standards
    A. Summary Judgment
    B. False Advertising and Unfair Competition under the Lanham Act and Common Law Unfair Competition

V. Factual Background

VI. Summary of Arguments
    A. Virtus' Motion
    B. Mission's Response
    C. Virtus' Reply

VII. Discussion

VIII. Recommendation

IX. Instructions for Service and Notice of Right to Object/Appeal

## I. JURISDICTION

Plaintiff asserts claims for patent infringement under the laws of the United States, false advertising and unfair competition under the Lanham Act, and common law unfair competition, invoking jurisdiction under 15 U.S.C. §§ 1116 and 1121, and 28 U.S.C. §§ 1331, 1338 and 1367.

## II. SUMMARY OF PROCEDURAL HISTORY and CLAIMS

Plaintiff Mission Pharmacal Company ("Mission") initiated this suit on March 7, 2013, when it filed its four-page original complaint asserting a single claim of patent infringement under the laws of the United States against defendant Virtus Pharmaceuticals, LLC ("Virtus").[4] More specifically, Mission's original complaint alleged that Mission is the owner as assignee of United States Patent No. 6,521,247 ("the '247 patent"), that issued on February 18, 2003, which claims, among other things, a nutritional supplement containing both a slowly dissolving and a rapidly dissolving iron compound, a method of alleviating iron deficiency with the dual iron nutritional supplement, and a method of making the dual iron nutritional supplement.[5]

Mission alleged that it sells CitraNatal® prescription prenatal supplements covered by the '247 patent and it understands Virtus manufactures, imports, sells, offers to sell, and induces others to sell, offer to sell, and use certain prenatal supplements including Natalvirt CA and Natalvirt 90 DHA whose formulation, use, and method of making are covered by claims of the '247 patent.[6] As relief, Mission sought the award of a permanent injunction, actual damages not less than a reasonable royalty, pre- and post-judgment interest, attorneys' fees, and such other relief as may be

---

4. Docket no. 1.

5. *Id.* at 2, ¶ 7.

6. *Id.* at 2, ¶¶ 9–11.

appropriate.[7] Mission demanded a trial by jury.[8]

On March 27, 2013, Virtus filed its answer to the original complaint that included affirmative defenses and a counterclaim seeking a declaratory judgment of noninfringement.[9] On April 17, 2013, Mission filed its answer to Virtus' counterclaim.[10]

On May 14, 2013, the parties submitted a "Discovery Plan with Proposed Scheduling Order."[11] On June 5, 2013, the Court entered its initial scheduling order that essentially tracked the format of the proposed order submitted by the parties.[12] Among other deadlines, the order established a discovery cut-off date of October 10, 2013, a deadline for dispositive motions of October 24, 2013, a pretrial conference date of January 30, 2014, with jury selection and trial to begin on February 3, 2014.[13] On July 8, 2013, the Court entered a "Confidentiality and Protective Order."[14]

On July 1, 2013, Virtus filed an opposed motion to amend the scheduling order to provide, in sum, for certain "patent-specific deadlines" and a *Markman* hearing.[15] Mission opposed the request.[16] On September 4, 2013, the Court entered an order denying the motion to amend the scheduling order.[17] On July 29, 2013, Virtus filed an amended answer and counterclaim.[18]

In the pleading, Virtus seeks declarations for both noninfringement and invalidity.[19]

Also on July 29, 2013, Mission filed its first amended complaint, asserting four claims in four separate counts: patent infringement, false advertising in violation of the Lanham Act, unfair competition in violation of the Lanham Act, and common law unfair competition.[20] More specifically, Mission alleges that it "manufactures and sells" prescription prenatal and iron supplements, CitraNatal Assure, CitraNatal 90 DHA, and Ferralet 90, each covered by the '247 patent (collectively "Mission Products"),[21] and Virtus is "engaged in the manufacture, distribution, marketing, sale and/or offer for sale in this district and elsewhere of alleged generic versions of . . . [the Mission Products]—which Virtus calls Natalvirt CA, Natalvirt 90 DHA, and Natalvirt FLT" (the "Virtus Products"), each of which "are covered by the claims of the '247 Patent."[22] Mission alleges that "[t]hrough at least their labels, product inserts, and other marketing materials, Virtus has represented that Natalvirt CA, Natalvirt 90 DHA, and Natalvirt FLT use the same ingredients in the same amounts as" the Mission Products[23] and "contain the same iron blend (carbonyl iron, ferrous gluconate)" as the Mission Products.[24] Mission alleges Virtus markets the Virtus

---

7. *Id.* at 3–4.

8. *Id.* at 4.

9. Docket no. 11.

10. Docket no. 17.

11. Docket no. 24.

12. Docket no. 32.

13. *Id.* at 1–2.

14. Docket no. 35.

15. Docket no. 33 at 4.

16. Docket no. 37.

17. Text-only order dated Sept. 4, 2013.

18. Docket no. 47.

19. *Id.* at 2–4.

20. Docket no. 48 at 8–13.

21. *Id.* at 2.

22. *Id.* at 3–4.

23. *Id.* at 4.

24. *Id.*

Products "as generic equivalents to and substitutes for" the Mission Products,[25] "has had these knockoff products linked to" the Mission Products, and "has made no effort to differentiate" the Virtus Products from the Mission Products.[26] Mission asserts the Virtus Products are not generic equivalents to, or substitutes for, the Mission Products because they are not bioequivalents.[27]

Further, Mission alleges Virtus has "falsely told national pharmaceutical databases that" the Virtus Products "use the ingredient ferrous gluconate and are therefore pharmaceutically equivalent."[28] Mission asserts Virtus' "advertisements and promotional claims" about the Virtus Products "are literally and/or impliedly false and misleading" because the Virtus Products "are not 'generic,' equivalent or substitutable for" the Mission Products "unless they have been demonstrated to deliver their active ingredients to patients at the same rate and in the same amount as" the Mission Products.[29] Mission alleges Virtus intentionally and knowingly incorporated into the Virtus Products "a ferrous gluconate formulated to delay the absorption of the iron compound" instead of the rapid-release compound found in the Mission Products, which is "likely to cause confusion, mistake or deception about the nature, characteristics and qualities of their knock-off solution in comparison, connection, or association with the Mission Products."[30] Specifically, Mission asserts the Virtus Products "cannot deliver iron to the patient at the same rate" as

Mission Products because "[u]nlike the Mission Products, which contain[ ] a fast dissolving ferrous gluconate that absorbs quickly into the body," the Virtus Products "use[ ] a ferrous gluconate formulated to delay its absorption."[31]

As relief, Mission seeks, in sum, preliminary and permanent injunctive relief to prevent the manufacture, distribution, use, sale or advertising of the Virtus Products or representing the Virtus Products are pharmaceutically equivalent to the Mission Products or can be freely interchanged with or substituted for the Mission Products.[32] Mission seeks corrective action to (a) require Virtus to remove information linking the Virtus Products to the Mission Products "in any drug information databases and/or pricing systems in the United States;" (b) include in any advertisement or promotion of the Virtus Products

> a notice in location · and typeface as prominent as the comparison itself, that '[the Virtus Product] is not equivalent to [the Mission Pharmacal product]. Therefore, the substitution of this product for [the Mission Pharmacal product] may violate state law,

and (c) take further "corrective action to correct any erroneous impression persons may have derived concerning the nature, characteristics or qualities" of the Virtus products, "including without limitation the placement of corrective advertising to prevent the inducement of others from substituting ... [the Virtus Products] ... for prescriptions of ... [the Mission Products] ...."[33] Mission also seeks actual damages

---

25. *Id.* at 5.

26. *Id.*

27. *Id.* at 6–8.

28. *Id.* at 9.

29. *Id.*

30. *Id.* at 10–12.

31. *Id.* at 7.

32. *Id.* at 13.

33. *Id.* at 14. Mission also seeks "such other relief as the Court may deem appropriate to prevent the trade and public from deriving

not less than a reasonably royalty, treble damages based on a finding of willful infringement, actual and consequential damages and any profits from advertising and marketing the Virtus Products; an award of three times the actual damages based on an exceptional case finding; pre and post-judgment interest; attorneys' fees; and costs.[34]

On August 14, 2013, Virtus filed its answer to the first amended complaint.[35] Virtus' answer included four affirmative defenses [36] and pleaded two counterclaims, one for a declaration of non-infringement of the '247 patent and a second for a declaration the '247 patent is invalid.[37] On August 15, 2013, Mission filed its answer to Virtus' amended counterclaims.[38]

On September 25, 2013, the parties filed a joint motion to stay the case and amend the scheduling order, in which the parties informed the Court they

> conducted in-person mediation with Eric Galton on September 23, 2013, and need additional time to conduct settlement negotiations resulting from the mediation. The parties respectfully request that the Court stay this case for thirty (30) days and extend certain deadlines so that the

parties may focus their efforts on settlement and avoid unnecessary expense.[39]

On September 27, 2013, the Court granted the motion and extended the discovery deadline to December 16, 2013, and the dispositive motions deadline to January 17, 2014.[40] On October 29, 2013, the Court granted the parties' second motion to stay the case, extending the discovery deadline to January 10, 2014, and the dispositive motions deadline to February 7, 2014.[41] On December 2, 2013, the Court denied defendant's motion for a further extension of the discovery period and lifted the stay implemented through the September 27, 2013 order.[42]

On December 20, 2013, Virtus filed its motion for partial summary judgment of noninfringement of the '247 patent, supported by an appendix of documents and evidence.[43] On January 6, 2013, Mission filed its cross-motion for partial summary judgment of infringement, supported by twelve exhibits,[44] and a motion to file its response to Virtus' motion for partial summary judgment under seal.[45] On January 7, 2014, the District Judge referred the case to the undersigned for pretrial man-

---

any erroneous impression concerning the nature, characteristics or qualities of Treagan (*sic* ) or from inducing others to substitute ... [the Virtus Products] ... for prescriptions of ... [the Mission Products] ...." *Id.* at 14–15.

**34.** *Id.*

**35.** Docket no. 50.

**36.** *Id.* at 5–6.

**37.** *Id.* at 6–8.

**38.** Docket no. 51.

**39.** Docket no. 57 at 1.

**40.** Docket no. 58.

**41.** Docket no. 60. *See* docket no. 59.

**42.** Docket no. 62. Prior to the parties' joint request for a stay, on September 20, 2013, Virtus filed an Opposed Motion for Leave to Serve Additional Interrogatories and to Extend Discovery Period. Docket no. 53. The December 2 motion denied this motion and, as noted, lifted the stay. Docket no. 62.

**43.** Docket no. 70, and exhibits A–K. This report cites to the pages of the document assigned by the CM/ECF system at the time the document was electronically filed and served, not the internal pagination of the document.

**44.** Docket no. 72, and exhibits 1–12.

**45.** Docket no. 71.

agement.[46] Thereafter, the parties submitted further briefing on their cross-motions regarding infringement and briefing closed on or about February 3, 2014.[47] On February 26, 2014, the undersigned entered a report and recommendation on defendant's motion for partial summary judgment for non-infringement of the '247 patent and on plaintiff's motion for partial summary judgment for infringement.[48] On March 28, 2014, the District Judge accepted the recommendations in the report.[49]

On February 7, 2014, Virtus filed a motion for partial summary judgment as to plaintiff's false advertising and unfair competition claims, supported by an appendix of documents and evidence.[50] The same day, Virtus filed an unopposed motion to seal certain exhibits to its motion,[51] which was granted on February 10, 2014,[52] and the exhibits were filed under seal that same day.[53] On February 21, 2014, Mission filed a response to Virtus's motion for partial summary judgment of false advertising and unfair competition.[54] The same day, Mission filed a motion to file certain supporting exhibits under seal,[55] which was granted on February 24, 2014,[56] and the exhibits were filed under seals.[57] On March 3, 2014, Virtus filed a reply in support of its motion.[58] The same day, Virtus filed an unopposed motion to seal a supporting exhibit,[59] which was granted on March 4, 2014,[60] and the exhibit was filed under seal.[61]

## III. ISSUE

Whether Virtus' motion for partial summary judgment on Mission's claims of false advertising under the Lanham Act, unfair competition under the Lanham Act, and common law unfair competition should be granted or denied.

## IV. STANDARDS

### A. Summary Judgment

The standard to be applied in deciding a motion for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part as follows:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judg-

---

**46.** Docket no. 73.

**47.** Docket nos. 74–78.

**48.** Docket nos. 84, 85.

**49.** Docket no. 96. *See also* docket nos. 89, 90, 94, 95.

**50.** Docket no. 79, exhibits 1–9.

**51.** Docket no. 80.

**52.** Text-only order dated Feb. 10, 2014.

**53.** Docket no. 80, exhibits 10–11.

**54.** Docket no. 81. The response is supported by eleven exhibits. *Id.*, exhibits A–K.

**55.** Docket no. 82.

**56.** Docket no. 83.

**57.** Docket no. 81, exhibits D–K.

**58.** Docket no. 86. The reply is supported by seven exhibits. *Id.*, exhibits A–G.

**59.** Docket no. 87.

**60.** Docket no. 88.

**61.** Docket no. 86, exhibit D. On March 12, 2014, Virtus filed a motion for a hearing on its motion for partial summary judgment as to plaintiff's claims of false advertising and unfair competition. Docket no. 91. The Court addresses Virtus' motion for a hearing in a separate order, issued along with this report.

ment as a matter of law.[62]

Mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment. Rule 56 requires that there be no genuine issue of material fact.[63] A fact is material if it might affect the outcome of the lawsuit under the governing law.[64] A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[65] Therefore, summary judgment is proper if, under governing laws, there is only one reasonable conclusion as to the verdict; if reasonable finders of fact could resolve a factual issue in favor of either party, summary judgment should not be granted.[66]

The movant on a summary judgment motion bears the initial burden of providing the court with a legal basis for its motion and identifying those portions of the record which it alleges demonstrate the absence of a genuine issue of material fact.[67] The burden then shifts to the party opposing the motion to present affirmative evidence to defeat a properly supported motion for summary judgment.[68] All facts and inferences drawn from those facts must be viewed in the light favorable to the party resisting the motion for summary judgment.[69] "The court need consid-

---

62. FED. R. CIV. P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

63. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

64. *Id.* at 248, 106 S.Ct. at 2510; *Thomas v. LTV Corp.*, 39 F.3d 611, 616 (5th Cir.1994).

65. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Wise v. E.I. DuPont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir.1995).

66. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

67. Rule 56(c)(1) provides:

Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
FED. R. CIV P. 56(c)(1). *See also Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53.

68. *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15.

69. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007); *Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 97 (5th Cir.1993). The Supreme Court explained in *Scott* that:

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to [the] facts. As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. at 380, 127 S.Ct. at 1776 (emphasis in original) (quoting FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510).

er only the cited materials, but it may consider other materials in the record." [70] Summary judgment motions permit the Court to resolve a lawsuit without the necessity of a trial if there is no genuine dispute as to any material facts and the moving party is entitled to judgment as a matter of law.[71] "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." [72]

If "the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." [73] The movant "must demonstrate the absence of a genuine issue of material fact, but does not have "to negate the elements of the nonmovant's case." " [74] "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." [75] On the other hand, if the movant meets its burden and the non-movant cannot provide some evidence to support its claim, summary judgment is appropriate.[76] The

Court may enter an order that does not grant all the relief requested by the motion, but states that "any material fact— including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." [77]

If the nonmovant cannot adequately defend against a motion for summary judgment, the remedy is a motion for relief under Rule 56(d), which provides:

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.[78]

Discovery motions under Rule 56(d) are "broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." [79] To be entitled to a

**70.** FED. R. CIV. P. 56(c)(3).

**71.** See Fields v. City of South Houston, 922 F.2d 1183, 1187 (5th Cir.1991).

**72.** FED. R. CIV. P. 56(c)(2).

**73.** Duffie v. United States, 600 F.3d 362, 371 (5th Cir.) (citing Celotex, 477 U.S. at 325, 106 S.Ct. at 2554) (internal punctuation omitted), cert. denied, —— U.S. ——, 131 S.Ct. 355, 178 L.Ed.2d 149 (2010).

**74.** Id. at 371; Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

**75.** Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist., 308 F.3d 451, 471 (5th Cir.2002) (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc )).

**76.** FED. R. CIV. P. 56(e); Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir.),

cert. denied, 537 U.S. 824, 123 S.Ct. 111, 154 L.Ed.2d 34 (2002).

**77.** FED. R. CIV P. 56(g).

**78.** See FED. R. CIV. P. 56(d).

**79.** Raby v. Livingston, 600 F.3d 552, 561 (5th Cir.2010) (discussing Rule 56(f)) (internal punctuation omitted); Culwell v. City of Fort Worth, 468 F.3d 868, 871 (5th Cir.2006) (same); Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1267 (5th Cir.1991) (explaining that under Rule 56(f), "[w]here the party opposing the summary judgment informs the court that its diligent efforts to obtain evidence from the moving party have been unsuccessful, a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.") (citation and internal punctuation omitted), cert. denied, 502 U.S. 1059, 112

continuance of a summary judgment proceeding to obtain further discovery prior to a ruling on a motion for summary judgment, the party opposing the motion must demonstrate how additional time and discovery will enable the party to rebut the movant's allegations there are no genuine issue of material fact.[80]

## B. False Advertising and Unfair Competition under the Lanham Act and Common Law Unfair Competition

Section 43(a) of the Lanham Act provides in part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such an act.[81]

To prove a claim of false advertising under the Lanham Act, a plaintiff must establish the following elements:

(1) a false or misleading statement of fact about a product;

(2) a statement which actually deceived or had the capacity to deceive a substantial segment of potential consumers;

(3) a material deception in that it was likely to influence a consumer's purchasing decision;

(4) the product was in interstate commerce; and

(5) plaintiff had been or was likely to have been injured as a result of the statement in issue.[82]

Failure to establish any element is fatal to a plaintiff's claim.[83] When the statements of fact at issue are literally false, plaintiff is not required to introduce evidence on the issue of the impact the statements had on consumers and the Court will assume the statements actually misled consumers.[84] If the statements are misleading,

---

S.Ct. 936, 117 L.Ed.2d 107 (1992). *See also Sapp v. Mem'l Hermann Healthcare Sys.,* 406 Fed.Appx. 866, 869 (5th Cir.2010).

**80.** *See Raby,* 600 F.3d at 561 (request for stay "must set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion") (citations and internal punctuation omitted).

**81.** 15 U.S.C. § 1125(a)(1)(B).

**82.** *Healthpoint, Ltd. v. Ethex Corp.,* No. SA–01–CA–646, 2004 WL 2359420, at *8 (W.D.Tex. Jul. 4, 2004) (citing *Logan v. Burg-*

*ers Ozark Country Cured Hams, Inc.,* 263 F.3d 447, 462 (5th Cir.2001); *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 495 (5th Cir.2000), *cert. denied,* 532 U.S. 920, 121 S.Ct. 1355, 149 L.Ed.2d 285 (2001); *Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1383 n. 3 (5th Cir.1996); and *Taquino v. Teledyne Monarch Rubber,* 893 F.2d 1488, 1500 (5th Cir.1990)).

**83.** *Pizza Hut,* 227 F.3d at 495.

**84.** *Id.* at 497 ("With respect to materiality, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers. In such a circumstance, the court will assume the statements actually misled consumers.").

but either ambiguous or literally true, there is no such presumption, and plaintiff must present evidence of actual consumer deception.[85] When seeking only injunctive relief, plaintiff must show that the statements have a tendency to deceive consumers by producing evidence that at least some consumers were confused.[86] When seeking to recover money damages for a misleading advertisement that is not literally false, plaintiff must prove actual deception,[87] which requires evidence that a substantial number of consumers were actually mislead by the advertisements.[88]

█ Unfair competition claims under the Lanham Act are governed by the same standard as those for trademark infringement, e.g., the likelihood of confusion.[89] Therefore, to prove a claim of unfair competition under the Lanham Act, a plaintiff must demonstrate that there is a likelihood of confusion.[90] "A 'likelihood of confusion' means that confusion is not just possible, but probable." [91]

█ Unfair competition claims under Texas law are analyzed under the same standard as unfair competition claims under the Lanham Act.[92] "[A]bsent an argument that there are differences between the federal and state versions of unfair competition claims, courts in the Fifth Circuit analyze these claims together." [93] "Unfair competition under Texas law 'is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.' " [94] Plaintiff must show an illegal act by defendant which interfered with plaintiff's ability to conduct its business.[95]

## V. FACTUAL BACKGROUND

Except as may be noted, the parties do not appear to contest the following facts, which are set forth to provide a background for the discussion of the motion addressed in this report:

Mission now owns the '247 patent which covers a nutritional supplement comprising an "iron compound selected to be slowly dissolving" and an "iron compound selected to be rapidly dissolving." Mission sells prescription prenatal dietary supplements marked by the '247 patent under the brand names CitraNatal Assure and Citra-

**85.** *Id.*

**86.** *Id.*

**87.** *Id.*

**88.** *Id.*

**89.** *Westchester Media v. PRL USA Holdings, Inc.,* 214 F.3d 658, 663 (5th Cir.2000).

**90.** *Matrix Essentials, Inc. v. Emporium Drug Mart,* 988 F.2d 587, 592 (5th Cir.1993) ("the touchstone of a section 1125(a) unfair competition claim is whether the defendant's actions are 'likely to cause confusion' "); *Christus Health Care Syss., Inc. v. American Consultants RX, Inc.,* No. SA:12–CV–1221, 2014 WL 1092096, at *5 (W.D.Tex. Mar. 18, 2014).

**91.** *Scott Fetzer Co. v. House of Vacuums Inc.,* 381 F.3d 477, 483 (5th Cir.2004).

**92.** *Scott Fetzer Co.,* 381 F.3d at 484; *Westchester Media v. PRL USA Holdings, Inc.,* 214 F.3d 658, 663–64 n. 1 (5th Cir.2000). *See also Amazing Spaces, Inc. v. Metro Mini Storage,* 608 F.3d 225, 236 n. 7 (5th Cir.2010) ("A[n] ... unfair competition action under Texas common law presents essentially 'no difference in issues than those under federal trademark infringement actions.' ").

**93.** *Healthpoint, Ltd. v. Allen Pharm., LLC,* No. SA–07–CA–526–XR, 2008 WL 728333 (W.D.Tex. Mar. 18, 2008) (citing *King v. Ames,* 179 F.3d 370, 374 (5th Cir.1999)).

**94.** *Taylor Publishing Co. v. Jostens, Inc.,* 216 F.3d 465, 486 (5th Cir.2000) (quoting *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 14 (5th Cir.1974)).

**95.** *Id.*

Natal 90 DHA and an iron supplement under the brand name Ferralet 90.[96] The Mission Products contain folic acid, carbonyl iron, and ferrous gluconate.[97]

The '247 patent was filed on March 31, 2000, and issued on February 18, 2003. Mission is the assignee of the '247 patent. During prosecution of the '247 patent, the applicant amended various claims, including claim 1, at least twice. After the patent issued, it was reexamined and an ex parte reexamination certificate issued on July 12, 2011, which further amended the claims, including claims 1 and 17. As reexamined, independent claim 1 of the '247 patent requires the combination of (a) folic acid, (b) an iron compound selected to be slowly dissolving in the form of carbonyl iron,[98] and (c) "an iron compound selected to be rapidly dissolving." Dependent claim 17 requires the third ingredient to be ferrous gluconate or a few other expressly identified iron compounds.[99]

Virtus developed "design-around" versions of the Mission Products[100] sold under the names Natalvirt CA (allegedly equivalent to CitraNatal Assure), Natalvirt 90 DHA (allegedly equivalent to CitraNatal 90 DHA), and Natalvirt FLT (allegedly equivalent to Ferralet 90).[101] As the Mission Products, the Virtus Products contain folic acid, carbonyl iron, and ferrous gluconate.[102] Mission and Virtus also agree that the Virtus Products contain ferrous gluconate, a compound identified in the '247 patent as a rapidly dissolving iron compound.[103] Mission and Virtus further agree that the Virtus Products "encapsulate" the ferrous gluconate they contain in "slow dissolving matrix," "use[ ] a formulated version of ferrous gluconate that captures the iron compound in a sustained release matrix," and "use[ ] a ferrous gluconate formulated for a delayed release."[104] The parties disagree as to whether the Virtus Products infringe the '247 Patent, with Virtus arguing that the

**96.** Docket no. 48 at 2; docket no. 79 at 2–3; docket no. 81 at 3.

**97.** Docket no. 79 at 4.

**98.** As discussed in the February 26 report, the patent provides two specific examples of slowly dissolving iron compounds: "Examples of slowing dissolving iron compounds include ferric pyrophosphate and carbonyl iron." *See* docket no. 85 at 18, n. 100. *See also* docket no. 79, exhibit 4, expert report of Dr. Stephen Byrn, exhibit C (the '247 patent) at 59, col. 12, lns. 66–67. But, as further discussed in the February 26 report, and as contended by both Virtus and Mission, the 2011 reexamination requires that the "iron compound selected to be slowly dissolving" must be carbonyl iron. *See* docket no. 85 at 18, n. 100, docket no. 70 at 7; docket no. 72 at 6. *See also* docket no. 79, exhibit 4, expert report of Dr. Stephen Byrn, exhibit C ("reexamination certificate") at 72, col. 1, lns. 27–32.

**99.** Reexamination certificate at col. 1, lns. 40–61 ("The nutritional supplement of claim 1, the rapidly dissolving iron compound is

selected from the group consisting of ferrous fumarate, ferrous sulfate, ferrous gluconate, ferric ammonium citrate, and iron protein succinylate.").

**100.** Docket no. 79 at 2 ("Mission found out that Virtus had designed around the '247 patent . . . ."); docket no. 81 at 3 ("Virtus manufactures and sells what it promotes as generic versions of certain Mission products").

**101.** *Id.* at 1–4; docket no. 81 at 3.

**102.** *Id.* at 1, 4; docket no. 81 at 3.

**103.** *Id.* at 5; docket no. 81 at 6. *See* reexamination certificate at col. 1, lns. 40–61 ("The nutritional supplement of claim 1, the rapidly dissolving iron compound is selected from the group consisting of ferrous fumarate, ferrous sulfate, ferrous gluconate, ferric ammonium citrate, and iron protein succinylate.").

**104.** Docket no. 79 at 4 (citing Mission's first amended complaint, docket no. 48, at ¶¶ 18, 19, 21, 29); docket no. 81 at 4, 6.

Virtus Products do not infringe based, in sum and part, on Virtus' intentional use of a formulated use of a version of ferrous gluconate that captures the iron compound in a sustained release matrix and because the ferrous gluconate in the Virtus Products is encapsulated in a slow dissolving matrix and is formulated for a delayed release, demonstrating that the Virtus Products are unlike the Mission Products which contain a fast-dissolving ferrous gluconate.[105]

Both Mission and Virtus agree that the Mission Products and the Virtus Products are regulated under the Food and Drug and Cosmetic Act ("FDCA").[106] The parties agree that prescription prenatal vitamins are not subject to the FDA's pre-market approval requirements that apply to "new drugs" and "approved products" and are not listed in the FDA's "Orange Book" that lists all FDA approved drugs that the FDA has determined can be marketed and sold as generic equivalent drugs.[107] Mission contends, and Virtus appears to concede, that both the Mission

Products and the Virtus Products are in interstate commerce.[108] Mission and Virtus further agree that the FDCA comprehensively regulates labels for food and drug products, to include the labels of the Mission Products and the Virtus Products, but disagree as to the source of the applicable regulations. Mission argues, in sum, the Mission and Virtus Products are regulated as drugs, not as prescription dietary supplements;[109] Virtus argues, in sum, the Mission and Virtus Products are regulated as prescription dietary supplements, not as drugs.[110]

## VI. SUMMARY OF ARGUMENTS

### A. Virtus' Motion

Virtus seeks partial summary judgment on three causes of action alleged in Mission's first amended complaint, that is, Mission's claim of false advertising in violation of the Lanham Act (count two), unfair competition under the Lanham Act (count three), and common law unfair competition (count four).[111] At the threshold,

---

105. Docket no. 79 at 4–5; docket no. 81 at 4.

106. 21 U.S.C. §§ 301–399f. Docket no. 79 at 3; docket no. 81 at 2. Mission and Virtus disagree as to the nature of the regulation. Movant Virtus argues "[both the Virtus Products and Mission's Products are *prescription dietary supplements* ... regulated under the ... FDCA ...." Docket no. 79 at 3 (emphasis added)]. But, Mission argues "all prescription prenatal vitamins, including both Mission's and Virtus's products are drugs, not dietary supplements. As such they are subject to the FDA's regulations pertaining to *drugs*." Docket no. 81 at 2–3 (emphasis added). In 1994, Congress enacted the Dietary Supplement Health and Education Act of 1994 ("DSHEA") as an amendment to the FDCA "to establish standards with respect to dietary supplements." *See* Pub. L. No. 103–417, 108 Stat. 4325 (codified at 21 U.S.C. §§ 301–399f).

107. Docket no. 79 at 3–4; docket no. 81 at 1–2.

108. Docket no. 81 at 11. *See generally* docket nos. 79, 86 (Virtus does not address this element of the claim of false advertising under the Lanham Act).

109. Docket no. 81 at 2–3.

110. Docket no. 79 at 3. Virtus also argues, "Mission ... attempts to conflate regulations applicable to prescription drug products with regulations related to food products (e.g., nutritional supplements) in order to create a false construct in a desperate, but ultimately doomed attempt, to save the false advertisement claims." *Id.* at 4.

111. *Id.* at caption and at 1. Virtus' motion states that it collectively refers to each of Mission's three causes of action at issue in its motion as "false advertisement claims." *Id.* at 2. To be clear, unless referring to a party's argument, references to Mission's false advertising claim in this report is a reference to Mission's Lanham Act violation asserted in

Virtus argues that both the Mission Products and the Virtus Products are dietary supplements regulated under the FDCA, as amended by DSHEA.[112] More specifically, Virtus argues the FDCA requires "five statements" to be made on the label for a regulated dietary supplement.[113] Virtus argues it is entitled to entry of judgment as a matter of law on the three claims at issue based on, in sum and in part, the truth of the statements on the labels of the Virtus Products. Virtus submits an appendix with eleven exhibits in support of its motion.[114]

In support, Virtus presents five main arguments. First, Virtus argues the labels on the Virtus Products are not "literally false," because the labels "accurately list the ingredients and their respective amounts."[115] Specifically, Virtus asserts Virtus's labels truthfully comply with DSHEA and provide 1) the statement of identity (name of the dietary supplement), 2) the net quantity of contents statement (amount of the dietary supplement), 3) the nutrition labeling, 4) the ingredient list, and 5) the name and place of business of the manufacturer, packer, or distributor.[116]

Virtus asserts there is no regulatory requirement for labeling the ferrous gluconate in the Virtus Products as sustained release, therefore "the failure to make the affirmative statement does not constitute a false statement."[117]

Second, Virtus argues Mission's contention that the "fast dissolution of ferrous gluconate in the body" provides a "pharmaceutical benefit" is unsubstantiated.[118] Virtus also argues "that Mission has been able to market rapid iron release as a benefit, does not make it scientifically supportable, much less make the failure to advertise its absence an improper action by Virtus."[119]

count two of the first amended complaint. Virtus' motion expressly sets out legal standards for "summary judgment," "dietary supplement regulations," and "false advertising." With respect to the standards for "false advertising" (which, again, apparently refers to all three causes of action at issue), Virtus appears to indicate the requirements of the *"prima facie* case of false advertising under § 43(a) of the Lanham Act" apply to all three claims. *See id.* at 7–8. But, Virtus' motion does not set out the elements of a Lanham Act unfair competition claim, a common law unfair competition claim, or expressly state (with citations to authority) that each of the three causes of action to which its motion is directed share element(s) on which there is no genuine issue of material fact that judgment as a matter of law should be entered for Virtus. Finally, Virtus' motion states Mission's common law unfair competition claim is alleged under Texas law. Docket no. 79 at 1, 2, 4, 8, 14. Mission's first amended complaint does not specify Texas law applies. *See* docket no. 48 at 1. Mission's response does not state Texas law does not apply. *See* docket no. 81.

112. *Id.* at 3, 6.

113. *Id.*

114. *Id.*, attached appendix, exhibits 1–11. The exhibits are: exhibit 1—excerpts from Rhett S. Daniels Depo.; exhibit 2—excerpts of Dr. Stephen Byrn Depo.; exhibit 3—plaintiff's amended complaint; exhibit 4—Dr. Stephen Byrn's expert report; exhibit 5—excerpts from Nancy Price Depo.; exhibit 6—excerpts from Douglas Leonard Depo.; exhibit 7—product packaging labels for Natalvirt CA and Natalvirt 90 DHA; exhibit 8—Dr. Boyd Beck's expert report; exhibit 9—excerpts of Louis Sanchez Depo.; exhibit 10—Mark Gallagher's expert report; and exhibit 11—Carmen R. Eggleston's expert report.

115. *Id.* at 8.

116. *Id.* at 9.

117. *Id.*

118. *Id.* at 10.

119. *Id.* at 10–11.

Third, Virtus argues "[t]he Virtus Products labels do not make any representation to any consumer that the Virtus Products are equivalent to" the Mission Products.[120] Virtus further argues "[e]ven if Virtus did represent that the Virtus Products are similar to Mission's Products, that would not be a false representation because they do have the same active ingredients in the same amounts."[121]

Fourth, Virtus argues its products' labels are not implicitly false, because, in sum, Mission has presented no proof of actual deception.[122] Specifically, Virtus contends "Mission has introduced no evidence that the dissolution rate of iron in a prenatal vitamin is material to a consumer,"[123] nor has Mission "produced any evidence that ... [the relevant consumers] ... are being confused or deceived by any Virtus labels, advertisement, or other representation."[124]

Fifth, Virtus argues "it is impossible for Mission to recover damages for these claims" because "there is no evidence that Virtus's labels caused any consumer to be confused or deceived."[125] Virtus relies on "Mission's Damages report, which devoted only two of its 60 pages to the false advertising and unfair competition claims" and stated, in part, "[i]t is not possible to determine if there are patient complaints resulting from the lack of immediate relief provided by the ferrous gluconate in the Accused Products and if[,] as a result, there are decreases in doctors' prescriptions writing habits for ... [Mission's Products] ... and/or any other Mission product."[126]

## B. Mission's Response

In response, at the threshold, Mission contends, contrary to Virtus' contention that the Virtus Products are dietary supplements subject to the DSHEA amendments to the FDCA, that even though prescription prenatal vitamins, such as the Mission Products and the Virtus Products, are exempt from the FDA's pre-market approval requirements that apply to "new drugs" or "approved drugs," they are subject to FDA regulations as drugs.[127] Therefore, Mission argues, for Virtus to represent that the Virtus Products (a) are "generic equivalents" to the Mission Products or (b) can be substituted for the Mission Products, Virtus must satisfy the FDA's definition of "generic" and the Virtus Products "must be both pharmaceutically equivalent and bioequivalent" to the Mission Products.[128] Mission argues there is "genuine issue of material fact" and "conflicting evidence regarding the truth or falsity of Virtus's generic drug advertising" that "preclude[s] summary judgment."[129] Mission submits ten exhibits in support of its response.[130]

---

120. *Id.* at 11.

121. *Id.* at 11–12.

122. *Id.* at 12.

123. *Id.* at 13.

124. *Id.* at 14.

125. *Id.*

126. *Id.* (citing exhibit 11, Expert Report of Ms. Eggleston, at ¶ 153).

127. Docket no. 81 at 1–4.

128. *Id.* at 2–3.

129. *Id.* at 12.

130. *Id.*, exhibits A–C, F; docket no. 82, exhibits D, E, G–J. The exhibits are: exhibit A— Feb. 11, 2013 letter from FDA to Edward John Allera denying Mr. Allera's Dec. 8, 2009 "citizen petition" which had asked FDA to issue order confirming "that certain prescription prenatal vitamins that are indicated for use in reducing the risk of neural tube defects and that contain 1 milligram (mg) to 4 mg folic acid, either alone or in combination with other vitamins and minerals, are generally

Mission sets out four main arguments in support. Mission argues each of its three causes of action at issue are premised on its allegation that Virtus' assertions the Virtus Products are generic to the Mission Products are, in sum, false and misleading.[131] First, Mission argues both the Mission Products and the Virtus Products are drugs within the meaning of the FDCA, not dietary supplements, are "subject to the FDA's regulations pertaining to drugs," and Virtus' "citations to regulations related to dietary supplements and arguments related to Virtus's compliance with such regulations are inapposite to its Motion."[132] Mission argues "the inclusion of folic acid in prescription prenatal vitamins renders the entire product a drug" within the meaning of the FDCA.[133] As further support, Mission notes that both the Mission Products and the Virtus Products are assigned National *Drug* Code ("NDC") numbers and "the Natalvirt products [is listed] in [the FDA's] National *Drug* Code Directory."[134]

Second, Mission argues that, applying the FDA's definition of "generic," the Virtus Products are not the generic equivalents of the Mission Products because the products are not pharmaceutically equivalent nor bioequivalent.[135] Mission argues the FDA's definition of "generic" should be used in connection with all drugs, regardless of their regulatory status.[136] In support, Mission cites this Court's decision in *Healthpoint, Ltd. v. Stratus Pharmaceuticals, Inc.*, in which the Court granted a preliminary injunction after finding plaintiff had demonstrated a likelihood of success in proving defendant falsely advertised a non-equivalent unapproved drug as a "generic."[137] Mission contends the products are not pharmaceutically equivalent and bioequivalent because, in sum, "Mission's products have a dual-iron formulation that provides patients with a rapid and a slow release of iron," but "by

recognized as safe and effective (GRAS/E) prescription drug products and are not new drugs under section 201(p) of the [FDCA] ... (21 U.S.C. 321(p)"); exhibit B—NDC Directory Search Results showing NDC number and listing for the Virtus Products; exhibit C—Amicus Curiae Brief for the United States, *Florida Breckenridge, Inc. v. Solvay Pharmaceuticals, Inc.*, Case No. 98–4606 (11th Cir. July 20, 1998); exhibit D—excerpts from Louis Sanchez Depo.; exhibit E—HDMA forms for Natalvirt CA, Natalvirt 90 DHA, and Natalvirt FLT; exhibit F—2–pages printed from http://www.virtusrx.com/About-Virtus-Pharmaceutical (last visited 2/21/14); exhibit G—RedBook®, New Product Information Forms for Natalvirt CA and Natalvirt 90 DHA; exhibit H—excerpts from Louis Sanchez Depo.; exhibit I—Jan. 21, 2013 letter from Virtus to Lauren Toriello, regarding Contract Number VPMHA11, in which Virtus agrees to supply Natalvirt CA, Natalvirt 90 DHA (and other, listed Virtus products not included in the collective designation "Virtus Products" as used in this report) at stated initial prices; exhibit J—sales data regarding the Virtus Products; exhibit K—documents regarding supply agreement between Virtus in Florida and Armada Health Care in New Jersey.

**131.** As in Virtus' motion, Mission's response focuses on its "false advertising claims." *See id.* at 12 ("Virtus is not entitled to judgment as a matter of law on Mission's false advertising claims and this Court should deny Virtus's Motion"). As noted, Virtus' motion expressly states it refers to all three claims at once as "false advertising claims." *See* docket no. 79 at 2. Mission's response contains no similar statement. *See generally* docket no. 81.

**132.** *Id.* at 4–5.

**133.** *Id.*

**134.** *Id.* at 5 (emphasis in original).

**135.** *Id.* at 5–6.

**136.** *Id.*

**137.** *Id.* (citing *Healthpoint, Ltd. v. Stratus Pharm., Inc.*, 273 F.Supp.2d 769, 790 (W.D.Tex.2001)).

Virtus's own admission, Virtus's products 'den[y] the patient of a fast dissolving gluconate in the body' and are therefore not bioequivalent." [138] Mission further argues:

Virtus freely admits that "Virtus intentionally uses a ferrous gluconate formulated for a delayed release," "Virtus denies the patient of a fast dissolving gluconate in the body," and "[t]he Accused Products are unlike Mission Products, which contain a fast dissolving ferrous gluconate." *See* Virtus's Motion for Partial Summary Judgment, Dkt. 70, 3–4 (Statement of Undisputed Facts). Given that Virtus acknowledges that its products provide a significant difference in the rate of release of the active ingredient iron Virtus essentially concedes that its products are not "generics" of Mission's products. [139]

Third, Mission emphasizes that "Mission does not contest (and has never argued) that there is anything false about Virtus's labels;" rather, "Mission's false advertising claims are premised on the fact that Virtus markets and promotes its products as generics of Mission's, which is itself a literally false statement." [140] Mission notes deposition testimony that shows Virtus does not promote its products to physicians, who write prescriptions, but to wholesale distributors and retail pharmacy chains to promote a pharmacist to fill a prescription written for a Mission Product with a Virtus Product instead, as a generic equivalent. [141] Virtus' website states Virtus is "focused on the development of generic prescription products," and "often sends its customers a form called a form produced by the Healthcare Distribution Management Association" ("HDMA") in which Virtus describes the Virtus Products—Natalvirt CA Combo, Natalvirt 90 DHA Combo, and Natalvirt FLT—as "generic" for Mission's Products—CitraNatal Assure, CitraNatal 90 DHA, and Ferralet 90 NF, respectively. [142] The HDMA form lists the Mission Products as the "Brand Name Equivalent" and the Virtus Products as "Generic Name for Brand." [143] Mission also argues Virtus has submitted new product information forms to the Red Book®, a database concerning prescription products, in which it indicates the Virtus Products are "generic" for the Mission Products. [144] Mission argues Virtus makes other statements that "necessarily imply that its Natalvirt products are equivalent to, and substitutable for, Mission's CitraNatal products," including a "chart that lists its product, under a column heading "Virtus Name," right next to Mission's product, under a column heading "Brand Name." " [145]

Fourth, Mission argues "[b]ecause Virtus's statements that its products are generics of Mission's products are literally false, Mission need not introduce evidence that the statements actually misled consumers." [146] Nevertheless, "[a]lthough evidence of actual deception is not required," Mission argues "Virtus's customers have actually been misled" because "Virtus has actually made sales of Natalvirt products," citing as evidence the fact "that Virtus has

138. *Id.* at 4.

139. *Id.* at 6.

140. *Id.* at 7.

141. *Id.*

142. *Id.* at 8.

143. *Id.*

144. *Id.* at 8–9.

145. *Id.* at 9–10.

146. *Id.* at 9 (citing *Healthpoint, Ltd. v. Ethex Corp.,* No. SA–01–CA–646–OG, 2004 WL 2359420, at *8).

actually made sales of Natalvirt products." [147] Namely, because Virtus communicates with distributors and retailers about selling to them the Virtus Products, "it would be reasonable for a jury to conclude that Virtus's statements actually mislead Virtus's [c]ustomers into believing that the Natalvirt products are equivalent to and substitutable for Mission's." [148] Stated differently, Mission argues "every sale of a Virtus Natalvirt product deprives Mission of a sale." [149]

## C. Virtus' Reply

Virtus' reply presents further arguments in support of its position that the Mission Products and Virtus Products at issue are each "dietary supplements, that Virtus complied with all regulations concerning dietary supplement labeling, and that none of its advertising is literally false." [150] Virtus presents eight main arguments.

First, Virtus argues "the words 'generic' and 'brand' have different meanings depending on the context (commercial v. regulatory)" as do the terms "drug" and "generic" which "are used loosely and do not mean the same thing in one context as another context." [151] That Virtus completed HDMA forms that identify the Virtus Products as "generic name for brand" and link its products with the Mission Products identified as "brand name equivalents," "does not mean the product has an NDA and the 'Generic Name For Brand' has an

[Abbreviated New Drug Application ("ANDA")]" and "the FDA's regulatory framework does not become operative depending on how products are listed on this form." [152] Virtus notes that it makes clear to its customers that the Virtus Products are not Orange Book products, the "USC codes" identify them as multivitamins, and "[t]herefore, Virtus does not hold these products out to be generics of approved drugs." [153]

Second, Virtus argues the Mission Products and Virtus Products "are clearly defined as dietary supplements and not drugs under Title 21[,] Food and Drugs Chapter 9, Federal Food, Drug, and Cosmetic Act," referencing the definition of "dietary supplement" in the FDCA. [154] Virtus also notes that the FDCA's definition of drug provides that a dietary supplement "is not a drug solely because the label or the labeling contains such a claim." [155] Without further explanation, Virtus concludes "[t]he FDCA clearly defines the Relevant Products as dietary supplements and clearly excludes them from being defined as a drug" such that the Virtus Products "are to be governed by regulations under dietary supplements and not Orange Book drugs." [156] Virtus notes that claim 1 of the '247 patent addresses a "nutritional supplement," not a drug. [157]

Third, Virtus asserts the Mission and Virtus Products "lack required drug claims," and "are simply indicated as dietary supplements for 'improving the nu-

---

147. *Id.* at 10–11.

148. *Id.* at 11.

149. *Id.* at 12.

150. Docket no. 86 at 1.

151. *Id.* at 1–2.

152. *Id.* at 2.

153. *Id.*

154. *Id.* at 2–3.

155. *Id.* Relatedly, Virtus states the "marketing/labels" for the products at issue "reflects that the industry considers these products 'Prenatal Vitamins' rather than 'Prenatal Drugs.'" *Id.* at 3.

156. *Id.*

157. *Id.* at 1.

tritional status of women.'"[158] Virtus emphasizes that the FDA's letter to Mr. Allera, submitted as an exhibit to Mission's response, provides "that combining a drug product (having drug/efficacy claim—e.g., reducing neural tube defect risks) with vitamins still makes the drug a drug that requires FDA approval [ ]," but it does not stand "for the proposition that folic acid (Vitamin B9) is always a drug or products with folic acid are always Orange Book drugs"[159] and "was not stating that all prenatal vitamins with 1 mg of folic acid are prescription (Orange Book) drugs."[160] Virtus argues Mission's arguments that "all generic drugs, including unapproved drugs, must be bioequivalent to be considered 'generic,'" "cannot be supported" because the Eleventh Circuit withdrew its opinion in *Solvay, Solvay* was distinguishable in any event because it involved drug products, not nutritional supplements," and neither the Mission Products or the Virtus Products "were required to go through ... an approval process" with the FDA.[161]

Fourth, Virtus argues "a product that requires a prescription does not make it a drug."[162] Virtus argues the Virtus and Mission Products "are prescription products, not because they are drugs, but because these products contain more than 1 mg of folate."[163]

Fifth, Virtus argues "Mission tests its products as dietary supplements."[164] Spe-

cifically, Mission uses a "[m]icrobiological test method according to USP 2021, USP 2022, and USP 2040, which are methods for dietary supplements," not the "microbial tests for pharmaceutical drug products [which] are USP method 61 and 62."[165]

Sixth, Virtus argues "Mission's labels do not comply with labeling rules for approved drugs," "lack the required 'side effects statement,'" and "[a]pproved drug labeling is HIGHLY regulated."[166] Thus, Virtus appears to argue the labels for the Mission Products support the conclusion those products are not approved drugs.

Seventh, Virtus argues "a product with a ... [NDC] ... is not necessarily a drug," noting that "[t]he FDA allows Unapproved Products to receive NDCs."[167] Thus, Virtus appears to argue that simply because the Mission and Virtus Products have NDCs does not mean the products are new drugs or approved drugs.[168]

Eighth, Virtus argues "bioavailability equivalence is only required for ANDAs" and NDAs, but the Mission and Virtus Products are neither.[169] Virtus acknowledges that, under *Axcan*, "the proper market definition" of "generic" can support a false advertising claim but asserts, with no supporting authority, that as "the products at issue are dietary supplements and bioequivalence is of no relevance, there is no 'proper market definition' of 'generic.'"[170] Virtus argues:

---

158. *Id.* at 5.

159. *Id.* at 4.

160. *Id.* at 5.

161. *Id.* at 5–6.

162. *Id.* at 6.

163. *Id.*

164. *Id.*

165. *Id.* at 7.

166. *Id.*

167. *Id.*

168. *Id.* at 7–8.

169. *Id.* at 8.

170. *Id.* at 9 & n. 15 (citing *Axcan Scandipharm, Inc. v. Ethex Corp.,* 585 F.Supp.2d 1067 (D.Minn.2007)).

Since Mission cannot demonstrate that Virtus's advertising is literally false, it must prove implict[ ] falsity under some industry, market standard of bioequivalence (not the FDA's standard for Orange Book drugs). However, implicitly false advertising requires evidence of actual confusion—and evidence of a different industry/market standard of bioequivalence.

In conclusion, Virtus argues "Mission cannot support a claim for literal falsity, and cannot meet the requirements of implicit falsity." [171] Therefore, Virtus asserts Mission's "false advertising claims fail as a matter of law." [172] Virtus further argues if the "federal false advertising claims fail, then the related unfair competition claims must be dismissed also as Mission failed entirely to even present a separate argu-

ment supporting unfair competition under the Lanham Act and Texas law." [173] Virtus submits seven exhibits in support.[174]

## VII. DISCUSSION

■ Virtus moves for partial summary judgment on Mission's Lanham Act false advertising and unfair competition claims and common law unfair competition claim.[175] Mission's allegations in support of its claims of common law and Lanham Act unfair competition are the same as those alleged for false advertising in violation of the Lanham Act.[176] Virtus' motion expressly addresses only the first element of a claim for false advertising under the Lanham Act—whether Virtus has made literally or implicitly false or misleading statements of fact about the Virtus Prod-

**171.** *Id.* at 10.

**172.** *Id.*

**173.** *Id.*

**174.** *Id.*, exhibits A–C, E–G; docket no. 87, exhibit D. The exhibits are: exhibit A—packaging labels for CitraNatal Assure, CitraNatal 90 DHA, Ferralet 90, Natalvirt FLT, Natalvirt 90 DHA, and Natalvirt CA; exhibit B—an informational packet on the Uniform System of Classification ("USC"), a chart of the First Data Bank and Medi–Span USC Codes, and product information for CitraNatal 90 DHA and CitraNatal Assure; exhibit C—Feb. 11, 2013 letter from FDA to Edward John Allera denying Mr. Allera's Dec. 8, 2009 "citizen petition;" exhibit D—Nov. 10, 2010 certificate of analysis of CitraNatal 90 (Dual Fe) and book excerpts on USP Procedures including "(61) Microbial Enumeration Tests," "(62) Tests for Specified Microorganisms," "(2021) Microbial Enumeration Tests—Nutritional and Dietary Supplements," "(2022) Microbiological Procedures for Absence of Specified Microorganisms—Nutritional and Dietary Supplements," and "(2040) Disintegration and Dissolution of Dietary Supplements;" exhibit E—Power Point presentation titled "An Introduction to the Improved FDA Prescription Drug Labeling;" exhibit F—Feb. 8, 3013

letter from FDA to Dr. S. Albert Edwards denying Dr. Edwards' Nov. 21, 2011 "citizen petition" which had asked FDA to "stop issuing NDCs for 'unapproved' drugs, that the Agency enforce this change of law and policy gradually over the next three years, and that any establishments who protest this change suffer 'immediate sanctions, including market withdrawal of their violative products;' " and exhibit G—March 2003 FDA publication titled "Guidance for Industry: Bioavailability and Bioequivalence Studies for Orally Administered Drug Products—General Considerations."

**175.** The parties do not explicitly assert which state's law applies to Mission's common law unfair competition claim. In the first amended complaint, Mission does not identify the source of any applicable state law. *See* docket no. 48 at 11–13. In its partial motion for summary judgment, Virtus cites a Texas appellate court opinion without contest from Mission. *See* docket no. 79 at 8; docket no. 81. The parties appear to agree that Texas law applies to Mission's common law unfair competition claim, thus, to the extent necessary, for purposes of this report, the Court will apply the elements of common law unfair competition under Texas law.

**176.** Docket no. 48 at 8–12.

ucts, and specifically, whether Virtus has made false or misleading statements of fact that the Virtus Products are generic equivalents to the Mission Products.[177]

Prior to addressing Virtus' central arguments in support of its request for partial summary judgment, as a threshold matter, the Court notes Virtus has not cited, expressly applied, or distinguished this Court's prior rulings addressing false advertising claims regarding unapproved drugs. In *Healthpoint v. Stratus Pharmaceuticals*, the Court addressed claims based on false representations defendant's products were "generic" to plaintiff's and could be substituted for prescriptions written for plaintiff's products.[178] The Court noted that the question of whether two products are generic is best left to the FDA, but "a drug manufacturer making a claim that a non-approved drug is 'generic' to or a 'generic equivalent of' another non-approved drug must use the FDA's definition of 'generic' and, when such a representation is challenged, as here, through a Lanham Act false advertising claim with specific allegations that the use of the terms is false and unsubstantiated, must defend and be prepared to demonstrate why it stated that its drug is a 'generic equivalent,' that is, is 'identical or bioequivalent to a brand name drug in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.'"[179] The Court explained:

The primary jurisdiction of the FDA would not appear to bar a court from deciding Healthpoint's false advertising claim that Stratus has made false claims of "generic equivalence" or "bioequivalence" and has allegedly falsely represented that Kovia and Ziox have the "same ingredients" or the "same active ingredients." There is a distinction, on the one hand, between respecting the FDA's primary jurisdiction to determine in the first instance whether a drug is lawfully marketed, "generic," "bioequivalent," "therapeutically equivalent," "pharmaceutically equivalent" and, on the other hand, a Lanham Act claim that a false statement has been made about a product. Even though the FDA has not required Stratus to demonstrate the equivalence of Kovia to Accuzyme or the equivalence of Ziox to Panafil White, Stratus is not free to make false or misleading statements about its product. To hold to the contrary would mean that an administrative scheme could eviscerate a Lanham Act or related common law claim over which the agency has no jurisdiction. For example, if Stratus represents that its two ointments are "bioequivalent," "generically equivalent," "equivalent" or have "the same active ingredients" or "the same ingredients" or "the same active ingredients in the same amounts," consumers and competitors have a right to expect that such

177. Virtus' *motion* does not set out the elements of a Lanham Act unfair competition claim, a common law unfair competition claim, or expressly state (with citations to authority) that each of the three causes of action to which its motion is directed share element(s). *See generally* docket no. 79. Virtus' motion collectively references all three claims as "false advertising claims" and only provides argument directed to "claims" of "false advertising." Virtus' *reply* does address each cause of action separately, docket no. 86 at 10, but primarily in criticism of Mission's response. *Id.* Virtus has not argued, or disavowed, in its motion or reply, that its arguments regarding the truth and accuracy of its advertising statements should not equally be considered with respect to each of the three causes of action on which it seeks summary judgment.

178. 273 F.Supp.2d at 792.

179. *Id.* (citation omitted).

representations have factual support and the Lanham Act provides a vehicle to enforce that expectation.[180]

The Court stressed that Healthpoint was not alleging that Stratus had falsely implied FDA approval, but instead the claims were "of false or misleading comparisons between two specific products in the context of comparative advertising and promotion relating to whether one drug can be substituted for another under state law."[181] Later in the case, at the summary judgment stage, the Court concluded—"[s]etting aside the questions of whether under the FDA standards, Kovia and Ziox are generics for Accuzyme and Panafil, questions for the FDA and not for the Court"—it was a "question[ ] of fact" whether defendant had marketed its products in such a way to suggest they were interchangeable with plaintiff's products but had no evidence to show they were.[182]

In *Healthpoint, Ltd. v. Ethex Corporation*, the Court addressed whether Ethex had falsely advertised its product as an alternative to plaintiff's product, that is, had made false and misleading statements that its ointment was "a generic form of, the same as, a substitute for, an alternative to, a therapeutic equivalent to or substitute for" plaintiff's ointment.[183] The Court concluded that the underlying question of whether Ethezyme is a "generic" to Accuzyme is an issue "committed to the FDA" that the Court should not address,[184] and, further, "the Court should not change the FDA's definitions of such related terms of art as 'pharmaceutical equivalent,' 'therapeutic equivalent,' 'bioequivalence,' and 'pharmaceutical alternative,'"[185] as "[n]ew definitions of FDA terms would undercut national uniformity regarding federal laws regulating the drug market or would confuse the public and undermine confidence in the drug supply in general and generic drugs in specific."[186] The Court recognized that Ethex's witnesses testified that there are "generic alternatives" that do not need to be approved by the FDA and that the term "generic" may be used "without confusion with respect to drugs that are similar but not necessarily therapeutically equivalent," but noted that it is in the FDA's interest to ensure that "only one definition of FDA terms of art, such as 'therapeutically equivalent' and 'generic,' is used in the context of drug approval, acceptance and use."[187] The Court ultimately enjoined Ethex from including in further print advertisements

---

180. *Id.* at 792–93 (footnotes omitted).

181. *Id.* at 793.

182. *Healthpoint, Ltd. v. Stratus Pharm., Inc.*, 273 F.Supp.2d 871, 891 (W.D.Tex.2001).

183. 273 F.Supp.2d 817, 824, 830 (W.D.Tex. 2001).

184. *Id.* at 841–42.

185. *Id.* at 843.

186. *Id.* The Court further stated:
> Although Lanham Act or related common law claims that concern whether Ethezyme is "the same as" Accuzyme—to the extent that determination requires a simple comparison of ingredients and does not entail a decision on whether sodium metabisulfite should be listed as an active ingredient—appear to be properly before the District Court, a determination of whether Ethezyme is "equivalent" to Accuzyme appears to be inextricably linked to the determination of whether Ethezyme is being marketed lawfully, a matter within the exclusive enforcement domain and "particular expertise" of the FDA. Similarly, the "task of identifying in the first instance whether one drug is the generic equivalent of another" belongs to the FDA ... The term "alternative" is less problematic ... [it] does not imply identity or equivalence.

> *Id.* at 843–44.

187. *Id.* at 866 (citations omitted).

comparing Ethezyme to Accuzyme language that "neither brand nor generic papain-urea compounds are subject to FDA approval or rating," because, in the context of other representations, it was misleading and inconsistent with its claim that Ethezyme is a "generic" equivalent.[188] "The over-all effect [was] to create the misleading impression that Accuzyme is the 'brand' and Ethezyme is a 'generic substitute for Accuzyme, when it has not been determined that Ethezyme is a 'generic' alternative to Accuzyme." [189]

Virtus argues the Virtus and Mission Products are "clearly defined as dietary supplements and not drugs under the" FDCA,[190] but Virtus fails to provide any evidence, argument, or authority demonstrating the products fit any applicable definition of a dietary supplement, or countering Mission's argument that the inclusion of a prescription-level amount of folic acid renders the products drugs.[191] Instead, Virtus quotes the FDCA's definition of a dietary supplement and, without analysis or attempting to distinguish the exception stated in the definition,[192] summarily states "[t]he FDCA clearly defines the [Virtus Products and Mission Products] as dietary supplements and clearly excludes them from being defined as a drug." [193] Virtus presents no authority or argument for why the Court must consider the Virtus Products and the Mission Prod-

---

188. *Id.* at 866.

189. *Id.* at 867. *See also Healthpoint, Ltd. v. Ethex Corp.,* No. SA–01–CA–646–OG, 2004 WL 2359420 (denying motions for partial summary judgment on claims of misappropriation of trade secrets, false advertising in violation of the Lanham Act, and common law unfair competition); *Healthpoint, Ltd. v. Allen Pharm., LLC,* No. SA–07–CA–526–XR, 2008 WL 728333 (denying motion to dismiss claims of false advertising and unfair competition under the Lanham Act, common law unfair competition, and common law misappropriation because, among other arguments, the FDA has the exclusive jurisdiction to determine if a wound-healing ointment is generic equivalent to, and substitute for, brand-name wound-healing ointment).

190. Docket no. 86 at 3.

191. Mission includes a letter dated February 11, 2013 from FDA to Edward John Allera, which states "when dietary ingredients are combined into a single dosage form with an ingredient intended for use as a drug [such as folic acid], the combination becomes a 'drug' under section 201(g) of the [FDCA]." *See* docket no. 81, exhibit A at 4–5 n. 17. Further, "as a statement of FDA policy, [the February 11 letter] is entitled to ... consideration." *Healthpoint, Ltd. v. Ethex Corp.,* 273 F.Supp.2d at 840 n. 113 (citing *Christensen v. Harris Cty.,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)).

192. *See* docket no. 86 at 3 (quoting 21 U.S.C. § 321(ff) ("Except for purposes of sections 201(g) and 417, a dietary supplement shall be deemed a food within the meaning of this Act.")).

193. Docket no. 86 at 3. The Court notes that the FDCA defines the term "drug" to include:

(A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clauses (A), (B), or (C) of this subsection.

21 U.S.C. § 321(g)(1). Neither party presents argument or authority to show its products meet any part of this definition. Further, although Virtus cites the definition of a "dietary supplement," set out in FDCA, Virtus does not distinguish the exception included within that definition. *See* docket no. 86 at 3 (quoting 21 U.S.C. § 321(ff) ("Except for purposes of sections 201(g) and 417, a dietary supplement shall be deemed a food within the meaning of this Act.")).

ucts are dietary supplements, are not drugs, and cannot be both dietary supplements and drugs at the same time.

Next, Virtus argues the meaning of "generic," when used to compare an equivalent to a drug, does not apply to the Virtus Products, as they are dietary supplements, not drugs or approved drugs. But, Virtus does not provide argument or authority to support any other definition of the term "generic" when it is applied to prescription prenatal vitamins and the products at issue.[194] Nor does Virtus present authority to support its apparent contention that the specific meaning of the term "generic," when used in reference to equivalents of approved drugs is not applicable to equivalents of dietary supplements.[195] Again,

Virtus does not attempt to distinguish case law cited by Mission, including this Court's prior precedent.[196] Even if the labels of the products at issue show the "same ingredients" in the "same amounts," Virtus admits "it has not published or commissioned any studies demonstrating that the Virtus Products deliver their active ingredients to patients at the same rate and in the same amount as" the Mission Products.[197]

Further, Virtus contends marketing the Virtus Products as equivalent to the Mission Products "would not be a false representation because [the Virtus Products] do have the same active ingredients in the same amounts."[198] Therefore, Virtus ar-

---

**194.** Mission argues that under the FDA's definitions, a generic equivalent must be "therapeutically equivalent" to the originator drug, which means it must be pharmaceutically equivalent and bioequivalent. Docket no. 81 at 6 (citing 21 U.S.C. § 355(j)(2)(A)(i)-(viii); 21 C.F.R. § 320.1(c), (e); *Axcan Scandipharm.*, 585 F.Supp.2d at 1074 n. 8). Pharmaceutical equivalence means drug products in identical dosage forms that contain identical amounts of the identical active drug ingredients. *Id.* (citing 21 C.F.R. § 320.1(c)). Bioequivalence means there is no significant difference in the rate and extent to which the two drugs' active ingredients are available at the site of the drugs' action. *Id.* (citing 21 U.S.C. § 355(j)(8)(B); 21 C.F.R. § 320.1(e)).

**195.** *See Healthpoint, Ltd. v. Allen Pharm., LLC,* No. SA–07–CA–526–XR, 2008 WL 728333, at *16 ("There is no indication from the Complaint that the FDA has or intends to determine whether AllanDerm is a 'generic' to or 'substitute' for XenaDerm, or even whether they are pharmaceutically equivalent, therapeutically equivalent, or bioequivalent. * * * Even among those courts allowing the claims to proceed, however, there is disagreement over whether Plaintiffs can or must use the FDA's definitions of related terms as the applicable standard in evaluating the truth or falsity of the advertising. *Compare Axcan Scandipharm,* 585 F.Supp.2d 1067 (plaintiff's claim could proceed if it used the

'proper market definition' or 'generally understood meaning') *with Solvay Pharm., Inc. v. Ethex Corp.,* No. Civ. 03–2836, 2004 WL 742033 (D.Minn. Mar. 30, 2004) (claim could proceed using FDA regulations or other market definition) and *with Healthpoint, Ltd. v. Stratus Pharm., Inc.,* 273 F.Supp.2d 769 (plaintiff must use the FDA's definitions). In this case, it is not clear whether Plaintiffs seek to utilize the FDA regulations to establish the standard or whether they seek to utilize a market definition or definitions under Texas law.").

**196.** *See* docket no. 81 at 5–6 (citing *Healthpoint, Ltd. v. Stratus Pharm., Inc.,* 273 F.Supp.2d at 769).

**197.** Docket no. 50 at 4, ¶ 29. Again, purported, expected differences in the dissolution rate of the ferrous gluconate (or other identified iron compound "selected to be rapidly dissolving") contained in the Virtus Products (because it is contained in a slow-dissolving matrix) as opposed to the Mission Products, is one of Virtus' key arguments in defending against infringement of the '247 patent.

**198.** Docket no. 50 at 3, ¶ 17; docket no. 79 at 11–12. Virtus does not explain the inconsistent position Virtus took in its motion for partial summary judgment on Mission's patent infringement claim. *See* docket no. 70. There Virtus contended that it does not in-

gues the labels are true, and furthermore, "Mission has introduced no evidence that the dissolution rate of iron in a prenatal vitamin is material to a consumer."[199] These arguments are unavailing. First, Virtus has presented no authority to support its position that those marketing products can make false statements about a product so long as the misrepresentation is about a product characteristic not important to (some, most, or all) consumers. Second, even if the labels on the Virtus Products "do not make any representation to any consumer that the Virtus Products are equivalent to" the Mission Products,[200] Virtus has presented no authority to show false or misleading claims of equivalency are not actionable under the Lanham Act or the common law.

Mission has presented competent summary judgment evidence to show Virtus has made allegedly false or misleading statements about the equivalency of the Virtus Products and the Mission Products. Mission has submitted the testimony of Virtus employee, Louis Saenz, who ex-

plains Virtus' use of HDMA forms, which are "standard form[s] that tell[ ] you our product name, case size, case dimensions, item size."[201] Specifically, Mr. Saenz stated Virtus has marketed the respective Virtus Products as equivalent to the respective Mission Products to wholesalers, distributors, and retailers, such as "McKesson, Cardinal, ABC, Walgreens."[202] Mr. Saenz verified that the HDMA form lists a "brand name product," for example, Mission's Ferralet 90, for a "brand name equivalent," for example, Virtus' Natalvirt FLT, and he sent that form to Walgreens, through Walgreens' primary wholesaler, Cardinal.[203]

Virtus argues that HDMA forms that identify the Virtus Products as "generic name for brand" and link its products with the Mission Products identified as "brand name" products, "does not mean the product has an NDA and the 'Generic Name For Brand' has an ANDA," and further contends "the FDA's regulatory framework does not become operative depending on how products are listed on this

---

fringe the '247 patent because the Mission Products contain folic acid, an iron compound selected to be slowly dissolving (carbonyl iron) and an iron compound selected to be rapidly dissolving (ferrous gluconate or any qualifying compound selected to be rapidly dissolving) whereas the Virtus Products contain folic acid and two iron compounds selected to be slowly dissolving (carbonyl iron and ferrous gluconate). *See id.* Virtus has presented no authority to support its contention that the slow-dissolving matrix used with its products is not a material fact-based difference relevant to whether it is a misleading misrepresentation for Virtus to state the Virtus Products are generic or equivalent to the Mission Products.

**199.** Docket no. 79 at 13.

**200.** *Id.* at 11.

**201.** *See* docket no. 81, exhibit D, deposition of Louis Horatio Saenz ("Saenz deposition"). Thus, Mission has produced some evidence

raising a fact issue as to whether the retail pharmacist, filling a prescription for a Mission Product, the "brand name product," might dispense instead the corresponding Virtus Product, the "brand name equivalent," under the mistaken assumption the two have been determined to be "generic equivalents" or that otherwise there is factual support for the claim of equivalency.

**202.** Saenz deposition at 45–47.

**203.** *Id.* at 74–76. Further, Mission provided an email dated April 23, 2013, purportedly from Danielle Reyes, an employee with Virtus, to David Becher from Cardinal Health, the wholesaler for Walgreens, in which it appears Ms. Reyes responds to Mr. Becher's request for information prior to listing the Virtus Products in the Cardinal Health database for a Walgreens contract by including, among other documents, the HDMA forms for Natalvirt FLT, Natalvirt 90 DHA, and Natalvirt CA. *See id.*, exhibit E, Reyes email communication dated April 23, 2013.

form." [204] Virtus also argues that it makes clear to its customers that the Virtus Products are not Orange Book products, the "USC codes" identify them as multivitamins; [205] "[t]herefore, Virtus does not hold these products out to be generics of approved drugs." [206] But, whether the Virtus Products are, in fact, equivalent to the Mission Products remains a contested issue of fact. Further, there is a genuine issue of material fact whether Virtus' representing that the Virtus Products—whether as drugs, unapproved drugs, or dietary supplements—are "brand name equivalents" to the Mission Products is a false or misleading statement of fact about the Virtus Products because Virtus has adduced no evidence of equivalence other than the identity of the corresponding product labels, has cited no authority to show the identity of the corresponding product labels is dispositive as a matter of law, and Mission contests the equivalency of the corresponding products based, in part, on Virtus' own claims about the dissolution rate of the ferrous gluconate (or other identified iron compound "selected to be rapidly dissolving") in Virtus' relevant products.

In sum, Virtus has not demonstrated there are no genuine issues of material fact that preclude entry of judgment as a matter of law on Mission's claims of false advertising under the Lanham Act, unfair competition under the Lanham Act, and common law unfair competition. Because Virtus does not provide specific argument, evidence and authority to require an analysis of Mission's Lanham Act and common law unfair competition claims that is distinct from the analysis of Mission's Lanham Act false advertising claim, for the same reasons Mission has raised a genuine issue of material fact to preclude summary judgment on its false advertising claim, there is a genuine issue of material fact to preclude entry of judgment as a matter of law on Mission's two unfair competition claims.[207] There is a genuine issue of material fact whether Virtus makes false or misleading statements when it states the Virtus Products are equivalent to the Mission Products.[208]

## VIII. RECOMMENDATION

Based on the foregoing discussion, it is **RECOMMENDED** that Virtus' motion for

---

**204.** Docket no. 86 at 2.

**205.** *Id.*

**206.** *Id.*

**207.** *See Laughlin Prod., Inc. v. ETS, Inc.,* 257 F.Supp.2d 863, 871–72 (N.D.Tex.2002) ("After reviewing the plaintiffs' complaint, and in view of the fact that they do not provide the Court with any specific elements or theories of their common-law claims that would require a different analysis from that used by the Court in ruling on the plaintiffs' federal-law claim[] [for false advertising under the Lanham Act], the Court concludes that, regardless of whether these claims are preempted by federal law, the defendant is entitled to summary judgment for the same reasons discussed above."), *aff'd,* 68 Fed.Appx. 976 (Fed. Cir.2003).

**208.** The Court has noted that certain of the arguments and exhibits submitted by both parties refer to products other than the six products included in the collective designations "Mission Products" (CitraNatal Assure, CitraNatal 90 DHA, and Ferralet 90) and "Virtus Products" (Natalvirt CE, Natalvirt FLT, and Natalvirt DHA). For example, in its response, Mission refers to Natalvirt CA Combo, Natalvirt 90 DHA Combo, and Ferralet 90 NF. Docket no. 81 at 8. *See also id.,* exhibit E (referencing Natalvirt CA, Natalvirt 90 DHA, and Natalvirt FLT); exhibit G (referencing Natalvirt CA and Natalvirt 90 DHA); exhibit I (referencing Natalvirt CA, Natalvirt 90 DHA, and other products). In its reply, Virtus submits an exhibit referring to CitraNatal 90 (Dual Fe). Docket no. 86, exhibit D. The parties do not explain the discrepancies, or object to their party opponent's naming other products.

partial summary judgment as to Mission's false advertising and unfair competition claims under the Lanham Act and common law unfair competition claim, filed February 7, 2014,[209] should be **DENIED.**

## IX. INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO OBJECT/APPEAL

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either: (1) electronic transmittal to all parties represented by an attorney registered as a Filing User with the Clerk of Court pursuant to the Court's Procedural Rules for Electronic Filing in Civil and Criminal Cases; or (2) by certified mail, return receipt requested, to any party not represented by an attorney registered as a Filing User.

As provided in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), any party who desires to object to this Report must **file** with the District Clerk and **serve** on all parties and the Magistrate Judge written Objections to the Report and Recommendation within 14 days after being served with a copy, unless this time period is modified by the District Court. A party filing Objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Report will bar the party from receiving a *de novo* determination by the District Court.[210] Additionally, a party's failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Report will bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[211]

**SIGNED** and **ENTERED** this 10th day of April, 2014.

---

209. Docket no. 79.

210. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 472, 88 L.Ed.2d 435 (1985).

211. *Acuna v. Brown & Root Inc.,* 200 F.3d 335, 340 (5th Cir.2000); *Douglass v. United Serv. Auto. Ass'n,* 79 F.3d 1415, 1428 (5th Cir.1996).