# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 15, 2010

No. 08-20772

Charles R. Fulbruge III
Clerk

CHARLES D RABY,

Plaintiff-Appellant

v.

BRAD LIVINGSTON, Executive Director, Texas Department of Criminal Justice; CHARLES O'REILLY, Senior Warden, Huntsville Unit; UNKNOWN EXECUTIONERS; DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, GARZA, and STEWART, Circuit Judges.
EMILIO M. GARZA, Circuit Judge:

Charles Raby is a Texas prisoner under death sentence. Raby filed suit under 42 U.S.C. § 1983, asserting that Texas' method for lethal injection violates his right to be free of cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution. In the wake of the Supreme Court's decision upholding lethal injection in Kentucky in *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520 (2008), the district court denied Raby's FED. R. CIV. P. 56(f) motion for a continuance to permit further discovery regarding the

No. 08-20772

administration of the Texas protocol and granted summary judgment to Defendants.  We affirm.

I

A

Raby was convicted of capital murder and sentenced to death in 1994.  The Texas Court of Criminal Appeals affirmed his conviction and sentence in 1998, *Raby v. State*, 970 S.W.2d 1 (Tex. Crim. App. 1998), and the United States Supreme Court denied certiorari, *Raby v. Texas*, 525 U.S. 1003 (1998).  Raby unsuccessfully petitioned for state habeas corpus relief.  He filed a federal petition for the writ of habeas corpus, which was denied by the district court. We denied his application for a certificate of appealability, *Raby v. Dretke*, 78 F. App'x 324 (5th Cir. 2003) (per curiam), and the Supreme Court denied certiorari, *Raby v. Dretke*, 542 U.S. 905 (2004).  According to his counsel, Raby is currently litigating a separate action involving forensic DNA testing in the 248th Judicial District Court in Harris County, Texas.  No date has been set for his execution.

Raby initiated the present action under § 1983, seeking a permanent injunction barring Defendants from executing him in accordance with the lethal injection protocol promulgated by the Texas Department of Criminal Justice. Following the district court's denial of Defendants' motion to dismiss for failure to state a claim, Raby obtained a limited amount of discovery.  He deposed Defendant Charles O'Reilly, who, as Senior Warden at the Huntsville Unit, presides over lethal injection executions in Texas.

Before Raby could go forward with efforts to obtain other discovery, the Supreme Court issued a writ of certiorari in *Baze v. Rees*, granting review of a Kentucky Supreme Court case that had upheld the constitutionality of Kentucky's method of lethal injection.  217 S.W.3d 207 (Ky. 2006).  The district court subsequently entered a stay of all proceedings below pending the Supreme Court's resolution of *Baze v. Rees*.

No. 08-20772

The Supreme Court issued its decision rejecting the challenge to Kentucky's lethal injection protocol. *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520 (2008). The district court thereafter lifted the stay in this action and ordered the parties to submit supplemental briefing addressing the impact of *Baze* on Raby's challenge to Texas' method of lethal injection.

In accordance with the deadline imposed by the district court, Raby filed a brief addressing the impact of *Baze* on his claims. On that same day, Defendants filed a motion for summary judgment in which they argued that the Texas lethal injection protocol is indistinguishable from the Kentucky protocol and perforce constitutional. Thereafter, Raby filed a motion under FED. R. CIV. P. 56(f) to continue Defendants' motion for summary judgment, arguing that he must be given the opportunity to conduct full and adequate discovery before being put to the burden of responding to the pending motion. The district court denied Raby's motion under FED. R. CIV. P. 56(f) and granted the pending motion for summary judgment, treating Raby's June 16 brief and supporting evidence as a response to Defendants' motion for summary judgment. Raby filed a timely notice of appeal.

B

Texas adopted lethal injection as a means of execution in 1982 and has conducted over four hundred executions since that time. Pursuant to Article 43.14 of the Texas Code of Criminal Procedure, the mandatory means of execution in Texas is lethal injection. Texas has established a written protocol for the lethal injection procedure that is currently documented in the Execution Procedure adopted by the Texas Department of Criminal Justice, Correctional Institutions Division, effective May 2008 (the "Execution Procedure").

Like thirty of the thirty-six states (including Kentucky) that have adopted lethal injection as their chosen method of capital punishment, Texas uses the same combination of three drugs in its lethal injection protocol. Under the

No. 08-20772

Execution Procedure, executions are carried out by injecting the inmate with the following three chemicals: sodium thiopental (also known as sodium pentathol), a fast-acting barbiturate sedative that induces a deep, comalike unconsciousness when given in the amounts used for lethal injection; pancuronium bromide, a paralytic that inhibits muscular-skeletal movement but that has no effect on awareness, cognition, or sensation; and potassium chloride, a chemical that interferes with the contractions of the heart, inducing cardiac arrest.

The execution process is carried out by a "drug team" that includes at least one medically-trained individual. The medically-trained individual must be certified or licensed as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, or military corpsman and must have at least one year of professional experience prior to participating in an execution. Each new member of the drug team must follow the drug team through two executions and then participate in two executions under direct supervision before participating in an execution without supervision.

In preparation for an execution, the drug team members prepare six syringes of normal saline (three for use as back-up) and two syringes each of solutions of sodium pentathol, pancuronium bromide, and potassium chloride in prescribed amounts (one of each solution to serve as a back-up set). After the inmate is secured to a gurney in the execution chamber, a medically-trained member of the drug team inserts two intravenous catheters, the second to be used as a back-up. A medically-trained individual then connects an IV administration set and starts the flow of normal saline through one IV line. After the saline IV has been started and is running properly, witnesses to the execution are brought into the appropriate viewing area and the condemned inmate is allowed to make a brief last statement.

After the order is given to commence the execution, a member of the drug team discontinues the flow of normal saline through the primary line and injects

4

No. 08-20772

the entire contents of a syringe containing the sodium pentathol solution. The line is then flushed with an injection of normal saline. The Execution Procedure mandates that designated officials (the Correctional Institutions Division Director or designee and the Huntsville Unit Warden or designee) observe the appearance of the condemned individual during application of the sodium pentathol. If, in the judgment of the designated observers, the inmate exhibits visible signs of being awake, the drug team members are instructed to switch to the back-up IV to administer another lethal dose of sodium pentathol, followed by a saline flush. Following either the one or the two doses of sodium pentathol, the drug team members inject the entire contents of the syringe containing the pancuronium bromide solution into the IV line and then flush the line with normal saline. The drug team members next inject the entire contents of the syringe containing the potassium chloride solution into the IV line, followed by a saline flush if necessary. A physician then enters the execution chamber to examine the inmate and pronounce death.

The primary complaint against the three-drug protocol is that an improper or insufficient administration of the first drug can leave the inmate exposed to severe pain that results from the administration of the second and third drugs. This risk is heightened by the second drug, which paralyzes the inmate while leaving him fully conscious. The paralytic effect has the potential to mask any outward sign of distress while leaving the prisoner conscious to excruciating pain before death occurs. Thus, following this argument, the three-drug protocol is unconstitutional because it produces a risk that if the inmate is not properly sedated after the sodium pentathol is administered, he may experience excruciating pain from the latter two drugs that no one can detect. It is this risk that formed the basis of the challenge in *Baze* and that forms the basis of Raby's challenge in the instant case.

5

No. 08-20772

II

A

Raby does not seriously dispute that the above-described Texas Execution Procedure is substantially similar to the Kentucky protocol that the Supreme Court approved in *Baze*.[1]    Rather, he questions whether the actual administration of lethal injection in Texas follows the dictates of the Execution Procedure.    Relying on the concurring opinion of Justice Stevens for the proposition that a more complete record could change the result in *Baze*, 128 S. Ct. at 1542 (Stevens, J., concurring), Raby points to a number of "botched" executions, unreliable execution logs, and inconsistencies between the Execution Procedure and the deposition testimony of Warden O'Reilly regarding actual practices. According to Raby, even if the Texas Execution Procedure, as written, is within the safe harbor established by *Baze*, lethal injection in Texas is still unconstitutional because the actual practices materially differ from the established procedures and Texas' actual practices in executing inmates are the standard by which the constitutionality of its method of lethal injection must be judged. Raby maintains that the district court erred in dismissing his evidence of maladminstration as insufficient to remove the Texas procedure from the safe harbor created by *Baze*.

We review de novo a district court's grant of a motion for summary judgment, applying the same standard as the district court did in the first instance. *See Burge v. Parish of St. Tammany*, 187 F.3d 452, 465 (5th Cir. 1999).

---

[1] During oral argument, Raby backed away from his concession that the Texas Execution Procedure is substantially similar to the Kentucky protocol. As supposedly material differences, he pointed to the fact that Kentucky has ten training sessions per year for its drug team members and Texas has none (except for new drug team members), that Kentucky requires all members of the drug team rather than a single individual to be medically-trained, and that Kentucky has a one hour limit within which to establish the IV and Texas has none. We find none of these differences in the written protocol sufficient to take the Texas Execution Procedure, at least as written, out of the safe harbor established by *Baze*.

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 391 (5th Cir. 2009) (internal quotation marks and citations omitted). In reviewing the entire record, we consider "all evidence in a light most favorable to the non-moving party and draw[] all reasonable inferences in favor of the non-moving party." *Id.* (citations omitted).

Under *Baze*, to prevail on an Eighth Amendment challenge, condemned inmates must demonstrate "a 'substantial risk of serious harm,'" or "an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they [are] 'subjectively blameless for purposes of the Eighth Amendment.'" 128 S. Ct. at 1531 (quoting *Farmer v. Brennan*, 511 U.S. 825, 846, & 847 n.9 (1994)). Noting the settled principle that "capital punishment is constitutional" and that "there must be a means of carrying it out," *Baze*, 128 S. Ct. at 1529 (citing *Gregg v. Georgia*, 428 U.S. 153, 177 (1976)), the Court recognized that "[s]ome risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure." *Id.* A risk of future harm can qualify as cruel and unusual punishment only if the conditions presenting the risk are sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers. *Id.* at 1530–31 (citations omitted). "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual" under the Eighth Amendment. *Id.* at 1531.

Raby's claim is analogous to the claim considered in *Baze*. Just as in this case, Baze conceded that the lethal injection protocol would not give rise to cruel

or wanton infliction of pain if it was properly administered and based his claim on the risk that procedures would not be properly followed. Raby argues that his case is distinguishable because we are not dealing with a hypothetical risk in a state that had only executed one inmate by lethal injection, but rather actual practices employed in executing over four hundred inmates that demonstrate the risks are real. As material differences between the Execution Procedure and actual practices, Raby points to problems with the insertion of the IV, inadequate monitoring of the IV lines during the execution, failure to properly observe the appearance of the inmate after the sodium pentathol injection(s), and failure by the Warden to annually review the training and licensure of the drug team members or to even know the specific qualifications that drug team members must possess. As discussed below, we hold that these differences, to the degree they may exist, are not constitutionally significant.

As evidence of problems with the insertion of the IV, Raby points to anecdotal accounts of past executions in which the drug team had difficulty locating a suitable vein for the IV, often because of the inmate's intravenous drug use. However, difficulty in starting an IV in the arm of inmates who had destroyed their veins through drug use is not indicative of a failure to adhere to the Execution Procedure or of problems with the Execution Procedure itself. Quite the contrary, the sequence of the Execution Procedure prevents any risk that difficulties in inserting the IV will cause the severe pain Raby fears. Raby's claim is not based on any minor pain involved in multiple attempts to find an adequate vein, but rather on the risk of excruciating pain that would result if the second and third drugs were administered absent the sedative effect produced by proper administration of the first drug. Hence, Raby must show a connection between the difficulty in initially establishing the IV and the risk that the first drug will not be administered properly. He cannot demonstrate this connection because the Execution Procedure provides for a pause between the insertion of

8

the IV and the administration of the first drug. Witnesses are brought into the viewing area and the condemned inmate is given an opportunity to make a final statement *after* the IV has been inserted and the saline solution is properly infiltrating. Thus, any problems with the insertion of the IV are corrected, and the IV runs properly for several minutes before any of the lethal drugs are administered. Raby's emphasis on the insertion procedure is thus misplaced, as the Execution Procedure mandates that the IV is inserted and flowing properly before any potentially constitutionally significant risk of pain from the three-drug protocol materializes.

Raby also questions whether the IV lines are properly monitored during the administration of the lethal drugs, as required by the Execution Procedure. Under the written protocol, responsibility for watching the IV lines is distributed among the Huntsville Unit Warden, the Director of the Correctional Institutions Division, and the medically-trained member of the drug team. Although the Execution Procedure does not specifically require that anyone be in the room with the inmate, it is clear from Warden O'Reilly's deposition testimony that he is in fact present throughout the execution and specifically watches the inmate's arm while the drugs are being injected. In *Baze*, where the plaintiffs also raised concerns about the adequate monitoring of the IV lines, the Court did not find that the risk rose to the level of a constitutional violation because the warden and deputy warden were in the execution room to monitor for signs of any problems. 128 S. Ct. at 1534. The Court also found the lack of training in monitoring IVs insignificant because medical expert testimony established that the average person could easily identify signs of infiltration from the swelling that would occur if the fluid did not enter the vein. *Id.* Raby has not put forth any justification for departing from the Court's reasoning on this issue. Thus, following *Baze*, we find the issues that Raby has raised concerning the monitoring of IV lines do not rise to the level of constitutional significance.

No. 08-20772

Raby argues that the designated officials are failing in their duty to observe the appearance of the inmate for visible signs that he or she is awake after delivery of the sodium thiopental. However, contrary to Raby's presentation, Warden O'Reilly's deposition testimony specifically affirmed that he monitors the inmate following the delivery of the sodium thiopental. He stated that in his experience, breathing and movement stop after about fifteen seconds. He also noted that, at this point, the inmate usually either snores twice or takes two deep breaths, which is consistent with the expert medical testimony regarding the effects of sodium thiopental. He further explained that, should problems arise, he can address them, but that during his tenure as Warden at Huntsville, there has never been a problem with the delivery of the drugs requiring the use of the backup lines. The record evidence fails to establish that the designated officials are not visually observing the inmate,[2] and *Baze* forecloses a holding that any type of additional observation (*i.e.*, EKG, eyelash testing, pinching) is required by the Constitution. *Id*. at 1536–37. Accordingly, we find no constitutional issues with regard to the monitoring of the inmate's appearance for visible signs that the inmate is awake following the sodium thiopental injection.[3]

---

[2] In fact, Warden O'Reilly testified that everyone was watching. "The people who insert IV's are watching from the back. The people who are administering the drugs are watching from in back and I'm watching from in front. I mean we're all watching for any signs of a problem."

[3] The deposition testimony also makes clear that there is in fact a pause between the injections. Although, as Raby notes, Warden O'Reilly characterized the interval as "a second," he immediately testified that there is a saline flush between each injection. It is inconceivable that the drug team members charged with administering the drugs could disconnect the previous injection, flush the line with saline, and reconnect the next injection within a second. Furthermore, the Execution Procedure mandates, and the deposition testimony corroborates, that the responsible officials visually observe the inmate's response to the first drug and that only if the inmate exhibits no visible sign of being awake does the responsible official instruct the drug team to proceed with the next injection. The Execution Procedure thus provides a double safeguard, a saline flush and a visual observation followed by instruction to proceed, minimizing the risk that too short a pause could occur at this most critical point. Even

No. 08-20772

As further evidence of material inconsistencies between the protocol and the practices, Raby points to Warden O'Reilly's failure to annually review the training and licensure of the drug team members or to even know the specific qualifications that drug team members must possess. During his deposition, Warden O'Reilly was asked to list the qualifications that each member of the drug team had to possess. He admitted that he did not know these qualifications offhand. He also acknowledged that he was only sure about the qualifications of the team member that he hired, but thought the previous Warden had hired according to policy. Although in a perfect world, the Warden would be able to tick off the requisite qualifications of all participants in the execution process, we do not find that his inability to do so calls into question the constitutionality of the process. These details are not even discussed in *Baze*. Furthermore, Raby has not alleged that any of the drug team members actually lack the necessary training. Accordingly, he has not established a connection between the Warden's understandable inability to list the required training from memory and the actual administration of the procedure. Insofar as the inconsistencies between the Execution Procedure and the deposition testimony are evidence of failure to follow protocol, we do not find that these minor inconsistencies rise to the level of constitutional significance. As discussed, in the moments most critical to Raby's contention that the protocol leads to an unconstitutional risk of pain, the Execution Procedure mandates, and the deposition testimony corroborates, that sufficient safeguards are in place to reduce the risk of pain below the level of constitutional significance. Raby's concerns regarding the Warden's failure to

---

without similar safeguards, the Fourth Circuit upheld the constitutionality of Virginia's lethal injection protocol after *Baze*. *See Emmett v. Johnson*, 532 F.3d 291, 301–03 (4th Cir. 2008) (noting that, even with Virginia's rapid-flow method of administering drugs without pause, the risk of pain from the sodium pentathol not producing the desired sedative effect is less than 3/100 of one percent, and thus not constitutionally significant).

11

review the qualifications of the staff are simply insufficient to establish a substantial or imminent risk that he will not be sufficiently anesthetized.

Viewing the evidence of maladminstration in the light most favorable to Raby, we do not find constitutionally significant differences between the Execution Procedure and the actual practices. Further, we find that the *Baze* safe harbor is broad enough to embrace Texas' lethal injection procedure. Raby misreads *Baze* when he suggests that it could only foreclose relief here if the lethal injection practices actually implemented in Kentucky and Texas were identical in all respects. The *Baze* Court considered and rejected the concern that the articulated standard "leaves the disposition of other cases uncertain," holding that "[a] stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain" and "show[s] that the risk is substantial when compared to the known and available alternatives." 128 S. Ct. at 1537. If a state employs "a lethal injection protocol substantially similar to the protocol" upheld in *Baze*, it will "not create a risk that meets this standard." *Id*. Because we read *Baze* to establish a much broader safe harbor than Raby contends, we have little difficulty finding that it protects Texas' method of lethal injection.

We hold that the Texas Execution Procedure, as written and as administered, is within the safe harbor established by *Baze*. We rest this holding on Raby's failure to establish that Texas' lethal injection protocol creates a demonstrated risk of severe pain. Because we find that Raby has failed to establish that the Texas lethal injection protocol creates a demonstrated risk of severe pain, we do not reach the second step of the *Baze* test, whether the risk created by the current protocol is substantial when compared to the known and available alternatives.

No. 08-20772

B

Before the district court ruled on Defendants' motion for summary judgment, Raby filed a motion under FED. R. CIV. P. 56(f) seeking to postpone a ruling on the summary judgment motion until Raby could conduct additional discovery. Through this additional discovery, Raby hoped to uncover, *inter alia*, specific instances in which an execution encountered complications, or in which the written protocol was not followed. The district court denied Raby's motion, finding that even if Raby were able to develop such facts, they would be insufficient to avoid summary judgment. Raby asserts that the district court abused its discretion by denying his Rule 56(f) motion for a continuance of summary judgment and granting Defendants' motion before Raby could conduct appropriate discovery.

We review district court dispositions of Rule 56(f) motions to suspend summary judgment for abuse of discretion. *Stearns Airport Equip. v. FMC Corp.*, 170 F.3d 518, 534 (5th Cir. 1999). Rule 56(f) discovery motions are "broadly favored and should be liberally granted" because the rule is designed to "safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Culwell v. City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006). The nonmovant, however, "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901 (5th Cir. 1980). Rather, a request to stay summary judgment under Rule 56(f) must "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *C.B. Trucking, Inc. v. Waste Management Inc.*, 137 F.3d 41, 44 (1st Cir. 1998) (internal quotation marks and citations omitted). "If it appears that further discovery will not provide evidence creating a genuine issue of material fact, the

13

district court may grant summary judgment." *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 720 (5th Cir. 1999); *see also Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990) ("This court has long recognized that a plaintiff's entitlement to discovery prior to a ruling on a motion for summary judgment is not unlimited, and may be cut off when the record shows that the requested discovery is not likely to produce the facts needed by the plaintiff to withstand a motion for summary judgment.").

Resolution of this issue places us squarely in the middle of the debate between the *Baze* plurality and Justice Stevens as to the impact of *Baze* on future litigation. Raby, picking up on Justice Stevens' argument, insists that our task is a fact-specific inquiry that underscores the extent to which reasonable and adequate discovery of the actual practices of an execution team may be determinative in examining the constitutionality of a lethal injection protocol. *See Baze*, 128 S. Ct. at 1542 ("The question of whether a similar three-drug protocol may be used in other States remains open, and may well be answered differently in a future case on the basis of a more complete record.") (Stevens, J., concurring). On the other hand, the plurality maintains that the standard, which requires the condemned prisoner to establish a demonstrated risk of severe pain that is substantial when compared to the known and available alternatives, resolves more challenges than Justice Stevens acknowledges. *Id.* at 1537. As a counter to Justice Stevens' concerns regarding future litigation, the plurality specifically establishes a safeguard for states with lethal execution protocols substantially similar to the Kentucky protocol. *Id.*

Remanding the case for Raby to continue with discovery would force us to adopt Justice Stevens' view over the controlling view of the plurality. This we cannot do. We read *Baze* to foreclose exactly the type of further litigation that Raby seeks to continue. The safe harbor established by *Baze* would hardly be safe if states following a substantially similar protocol nonetheless had to engage

14

in prolonged litigation defending their method of lethal injection. Absent some intentional malevolence on the part of the state in its administration of an otherwise acceptable protocol, it would be almost impossible for condemned inmates to meet the high burden of establishing "wanton exposure to objectively intolerable risk." *Id.* (quoting *Farmer*, 511 U.S. at 846).

In reaching this conclusion, we emphasize, as did the district court, that our review of the constitutionality of Texas' lethal injection protocol is not concerned with a risk of accident. The focus of our inquiry is whether the protocol inherently imposes a constitutionally significant risk of pain. "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947) (plurality opinion). Because the constitutionality of Texas' method of lethal injection turns on whether it inherently imposes a demonstrated risk of severe pain, "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty or that the procedure at issue gives rise to a 'substantial risk of serious harm.'" *Baze*, 128 S. Ct. at 1530–31 (quoting *Farmer*, 511 U.S. at 842). Raby has not indicated how any fact that he hopes to discover regarding failures by prison officials to follow the Execution Protocol will show how Texas' method of lethal injection inherently imposes a demonstrated risk of severe pain.

## III

We AFFIRM the district court's grant of summary judgment for Defendants and its denial of Raby's motion for a continuance under Rule 56(f).

CARL E. STEWART, Circuit Judge, concurs in the judgment only.