# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 9, 2020

Lyle W. Cayce
Clerk

No. 20-50210
Summary Calendar

WEI-PING ZENG,

*Plaintiff—Appellant*,

*versus*

TEXAS TECH UNIVERSITY HEALTH SCIENCE CENTER
AT EL PASO;
PETER ROTWEIN; RICHARD A. LANGE;
BEVERLEY COURT; REBECCA SALCIDO,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
No. 3:19-CV-99

Before KING, SMITH, and WILSON, *Circuit Judges*.

PER CURIAM:*

Texas Tech University Health Science Center at El Paso ("Texas Tech") fired Dr. Wei-Ping Zeng when, for several months and without

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 20-50210

proper authorization, he worked from his West Virginia home instead of the El Paso lab to which he was assigned. Zeng asserts that his termination was discriminatory, in violation of both Title VII and the Texas Commission on Human Rights Act ("TCHRA"), and that it violated his Fourteenth Amendment due process rights. In addition, Zeng puts forth defamation and tortious interference claims. The district court granted defendants' motion for summary judgment on all claims. We affirm.

## I.

Zeng obtained his Ph.D. in immunology and cell pathology from the State University of New York at Buffalo, underwent post-doctoral training in immunology at Yale University, and then entered academia as a faculty member at the University of Rochester in 1999. In 2009, Zeng left Rochester to begin working as an associate professor at Marshall University in West Virginia, where he was denied tenure in 2016.

On the heels of that denial, Zeng filed a grievance against Marshall and applied for a research associate position at Texas Tech. He was offered that position, moved to Texas, and began working under Dr. Haoquon Wu in 2017. Although Zeng rented an El Paso apartment, he retained a house in West Virginia.

Soon after beginning work in El Paso, Zeng sued Marshall in federal court in West Virginia. There, as here, Zeng appeared *pro se*. Needing to be present for those legal proceedings, and believing that, in any event, he could work more effectively from home, Zeng asked Wu for permission to work from West Virginia instead of at the El Paso lab, and Wu acquiesced. At some point in the ensuing months, Zeng terminated his lease in El Paso and lived only in West Virginia. He did not tell Wu that he was terminating his El Paso lease, nor did he inform anyone else at Texas Tech that he was working from West Virginia in the first place.

2

No. 20-50210

Thus, solely on Wu's permission, Zeng worked primarily from West Virginia from early May until early December 2017. Under Texas Tech's work-from-home policy, that's problematic. Texas Tech's policy requires that, to work from home, an employee must attain a signed "Telecommuting Agreement," which "must have the approval of the employee's unit head, the Dean or Director, the appropriate Department's Vice President, Human Resources, and President before it can be implemented." Zeng does not contest that, although he received permission from Wu, his work-from-home arrangement was not approved by the other necessary parties. In the absence of such an agreement, Texas Tech requires that its employees work "only at the employee's regular place of business or assigned duty point unless the employee . . . has received prior written authorization of the President," Dr. Richard Lange, "or his/her designee."

In November and December 2017, Texas Tech audited the employees in Zeng's department, comparing an employee's timesheets with the number of times the employee used his or her access badge to enter the building. Given that Zeng was in West Virginia at the time, his reported hours worked did not match the number of times he accessed the building. Specifically, the audit revealed that, although Zeng recorded normal working hours, he did not access the building on 119 of the 142 days that he was employed from May to December. Because the department was not aware of Zeng's work-from-home arrangement, that discrepancy understandably raised eyebrows.

Beverly Court, senior director of Zeng's department, scheduled a December 19 meeting with Zeng "to discuss Timesheets." Apparently not understanding the nature of the meeting, Zeng did not respond to the meeting invitation and did not attend. On December 21, Dr. Peter Rotwein, the chair of Zeng's department, emailed Wu to inform him of the situation. Wu, who was visiting China at the time, responded on January 7, explaining that Zeng was involved in a lawsuit and that Wu had authorized him to "work at

home for a while."

On January 8, 2018, Court sent Zeng another meeting request and an email, this time requesting Zeng to "confirm [he] received [the] email and will be available to meet." Zeng replied, informing Court that he was "not in El Paso" but would "try to come back as soon as possible." Court responded the next day, asking when he "plan[ned] to be at work so [they could] meet." Zeng vaguely replied that he would let her know when he returned and told her that "[t]here is something I have to deal with now, but I will come back as soon as I can." Later that day Rotwein emailed Zeng, informing him of the discrepancies revealed in the audit, that he was in violation of Texas Tech's work-from-home policy, and requesting that he provide a record of the work performed when he was not in the office. Zeng sent Rotwein a summary of that work on January 11, as requested.

On January 12, Court emailed Zeng again, this time informing him that he was being placed on leave without pay. A week later, Rotwein sent Lange an email explaining the situation and "request[ing] termination of Dr. Zeng's appointment for cause." About a week after that, Court emailed Zeng with an attached letter informing him that his employment was terminated effective January 22.

Zeng sued in state court, and the defendants removed to federal court on the basis of federal question and supplemental jurisdiction. In his second amended complaint, Zeng alleged discrimination under Title VII, the TCHRA, and 42 U.S.C. § 1981, violation of his Fourteenth Amendment due process rights, tortious interference, and defamation. Both sides sought summary judgment. The district court granted defendants' motion for summary judgment in full and dismissed all claims. Zeng appeals. We affirm.

No. 20-50210

## II.

## A.

Zeng first asserts that his firing was discriminatory, in violation of both federal and state law.[1] As an initial matter, we disagree with the district court that Zeng's TCHRA claims are barred by sovereign immunity. "[A] State waives [sovereign] immunity when it removes a case from state court to federal court." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618–19, 624 (2002). This maxim is in "the context of state-law claims, in respect to which the State has explicitly waived sovereign immunity from state-court proceedings." *Id.* at 617.

To be sure, "the Constitution permits and protects a state's right to relinquish its immunity from suit while retaining its immunity from liability . . . ." *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 255 (5th Cir. 2005). Thus, a state may waive its immunity from suit through removal and simultaneously retain its immunity from liability.

But that is not the case here. The TCHRA waives Texas's sovereign immunity from state-court proceedings. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008). And although the TCHRA does not "waive sovereign immunity [from suit] in *federal* court,"[2] the defendants have done that through removal. *Lapides*, 535 U.S. at 624.

---

[1] Zeng asserts claims under Title VII (race and nationality), 42 U.S.C. § 1981, and the TCHRA. "Because these three statutory bases are functionally identical for the purposes of [Zeng's] claims, it would be redundant to refer to all of them." *Shackleford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999). Thus, although we dismiss several claims on technical grounds, the substantive analysis would apply to all claims even if they remained viable.

[2] *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 332 (5th Cir. 2002); *see also Pequeno v. Univ. of Tex. at Brownsville*, 718 F. App'x 237, 241 (5th Cir. 2018) (applying *Perez* to the TCHRA).

Put another way, defendants do not enjoy "immunity from liability" because the TCHRA waived it. *Meyers*, 410 F.3d at 255. And defendants no longer enjoy "immunity from suit" because they waived it by removal. *Id.*; *see also Lapides*, 535 U.S. at 624. Thus, defendants waived sovereign immunity for the TCHRA claims in this case.[3]

Although there is no sovereign immunity, under the TCHRA only "*employers* may be liable for an unlawful employment practice. The Act does not create a cause of action against supervisors or individual employees." *Anderson v. Hous. Cmty. Coll. Sys.*, 458 S.W.3d 633 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (cleaned up). Similarly, although Congress abrogated sovereign immunity for state actors in Title VII, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447–48 (1976), a plaintiff cannot sue both an employer and its employees in their official capacity under Title VII. To do so would subject the employer to double liability, because "a Title VII suit against an employee is actually a suit against the corporation." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 262 (5th Cir. 1999). Thus, because Zeng opts to sue Texas Tech under Title VII and the TCHRA, he may not simultaneously sue the individual defendants.

So, where does that leave us? After we knock out the improper claims and revive the TCHRA claim, Zeng retains three operable discrimination

---

[3] None of the cases on which the district court or defendants rely is in conflict with that conclusion. Those cases involve instances in which the (1) the plaintiff raised waiver-by-removal argument for the first time on appeal and thus waived the argument itself, *Perez*, 307 F.3d at 331–32, (2) the plaintiff sued in federal court in the first instance and there was no waiver-by-removal argument to be made, *Pequeno*, 718 F. App'x at 240–41, or (3) the plaintiff averred that "removal waives immunity entirely" and attempted to rely on removal alone to waive immunity from both suit and liability, *Skinner v. Gragg*, 650 F. App'x 214, 218 (5th Cir. 2016) (per curiam). *Meyers* did not reach the question of whether the state "retained a separate immunity from liability . . . according to [the] state's law." *Meyers*, 410 F.3d at 255.

causes of action. He asserts Title VII and TCHRA discrimination claims against Texas Tech. Additionally, he maintains § 1981 claims against the individual defendants. Because those "three statutory bases are functionally identical for the purposes of [Zeng's] claims," our analysis below is sufficient to dispose of all claims together. *Shackleford*, 190 F.3d at 403 n.2.

For cases of intentional discrimination based on circumstantial evidence, such as this one, we apply the familiar *McDonnell-Douglas* burden-shifting framework.[4] Under that framework, a plaintiff must first establish a *prima facie* case of discrimination, which requires him to show that "(1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

If the plaintiff establishes a *prima facie* case, the burden of production "shifts to the employer to articulate a legitimate, nondiscriminatory or non-retaliatory reason for its employment action." *McCoy*, 492 F.3d at 557. If the employer is able to do so, then the burden shifts back to the plaintiff to show "that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose." *Id.* Because Zeng fails to make out a *prima facie* case of discrimination, we need not determine whether his violation of company policy provided a legitimate, nondiscriminatory reason for Texas Tech's employment decision.

Nobody contests that Zeng is a member of a protected class or that he

---

[4] *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (per curiam); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

was the subject of an adverse employment action. Instead, defendants assert that Zeng fails to make his *prima facie* case because he fails to offer evidence demonstrating that he was qualified for the position, and, even if he was, he was not treated less favorably than others under nearly identical circumstances. We assume that Zeng, as a Ph.D. in immunology, was qualified for the research assistant position. Our focus is instead on the fourth *prima facie* requirement—whether Zeng was treated unfavorably because of his protected status. He wasn't.

Zeng's *prima facie* case turns on whether the other employees that he identifies as comparators were similarly situated to him. *Lee*, 574 F.3d at 259. We construe "similarly situated narrowly, requiring the employees' situations to be nearly identical." *West v. City of Hous.*, 960 F.3d 736, 740 (5th Cir. 2020) (quotation omitted). "[E]mployees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated." *Lee*, 574 F.3d at 259–60. Moreover, "the conduct the employer points to as the reason for the firing must have been 'nearly identical' to 'that of the proffered comparator who allegedly drew dissimilar employment decisions.'" *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 244 (5th Cir. 2019) (quoting *Lee*, 574 F.3d at 260).

Zeng points to three groups as comparators: (1) Alexa Montoya and Christopher Lopez; (2) eleven other "employees with serious policy violations [who] were not terminated"; and (3) a final group of employees, all of whom were terminated but, according to Zeng, received "multiple opportunities and assistance to correct their behaviors prior to termination." We address each in turn.

We begin with Montoya and Lopez. Both of them worked in Zeng's department and, like Zeng, reported work hours that did not match their access badge data. Montoya reported normal working hours on 83 days when

she did not use her badge to access the building, and Lopez reported normal working hours on 24 days when he did not use his badge to access the building. But that resemblance aside, those two are not similarly situated to Zeng.

As an initial matter, both Montoya and Lopez cooperated with Court and others at Texas Tech to resolve the issue once the discrepancies were brought to light. Zeng, on the other hand, was given multiple opportunities to meet with Court to discuss his situation. On each occasion, Zeng either declined the opportunity or failed to respond at all. Therefore, even if Montoya's or Lopez's initial violations were "nearly identical" to Zeng's, the totality of their conduct was not.[5]

In any event, the violations were not themselves "nearly identical." First, Montoya's and Lopez's absences were less severe than Zeng's 119-day absence. Additionally, those absences were based on conduct distinct from Zeng's. Montoya, for example, told her supervisor that she was unable to swipe her badge to enter the building because her badge was not authorized for the proper times. Instead, although her badge data did not reflect it, Montoya maintained that she was in the building at the reported times after being let in by others coming and going. Similarly, Lopez informed Court that he failed to swipe his badge on occasion because "he was often walking into work as people were leaving and did not need to use his card to gain access to the building."

Thus, the violations by Lopez and Montoya were not "nearly identical" to Zeng's. To be sure, the violations were discovered by the same pro-

---

[5] *See Lee*, 574 F.3d at 260 ("If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001))).

cess: the internal audit. But the nature of the violations themselves—improper use of the access badge as distinguished from working remotely from West Virginia without proper authorization—is patently different.

Next, Zeng points to a group of employees that violated Texas Tech's policies but were not terminated. That collection of employees includes a billing associate, two clinical assistants, a senior medical secretary, a research administrator, and a mechanic (among other similarly disparate positions). The violations themselves are just as dissimilar, ranging from tardiness to sexual harassment. The only discernable commonalities in the group is that they worked for Texas Tech, were somewhere below Lange in the chain-of-command, violated some rule at some point during their employment, and were not fired for that violation. Zeng doesn't assert that they shared "the same job or responsibilities" or had "comparable violation histories." *West*, 960 F.3d at 740. Therefore, we agree with the district court that they were not similarly situated to Zeng.

Finally, Zeng offers a group of thirteen employees who were terminated under Lange but, unlike Zeng, "were offered multiple opportunities and assistance to correct their behaviors prior to termination." Like the previous group, this diverse bunch includes a wide array of positions, including a coding and reimbursement specialist, a patient services specialist, and a senior business assistant. And, again like the previous group, the violations range broadly. It is true that the employees on that list received multiple "strikes" before being fired. But because all of them had "different work responsibilities" and were "subjected to adverse employment action[s] for dissimilar violations," that is inapposite. *Lee*, 574 F.3d at 259–60.

Zeng fails to demonstrate that "he was treated less favorably because of his membership in [a] protected class than were other similarly situated employees who were not members of the protected class, under nearly iden-

tical circumstances." *Id.* at 259. Therefore, he fails to make his *prima facie* case of discrimination under the *McDonnell-Douglas* framework. We affirm summary judgment on the discrimination claims.

B.

Zeng asserts, under 42 U.S.C. § 1983, that defendants deprived him of a property and liberty interest without adequate procedure, violating his Fourteenth Amendment due process rights. But because Zeng was not deprived of a protected property or liberty interest, he was not owed any constitutional due process.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted). In the context of employment, a property interest arises "only when a legitimate right to continued employment exists." *McDonald v. City of Corinth*, 102 F.3d 152, 155 (5th Cir. 1996). A liberty interest arises "only when the employee is discharged in a manner that creates a false and defamatory impression about him." *Bledsoe v. City of Horn Lake*, 449 F.3d 650, 653 (5th Cir. 2006) (cleaned up). We address the two interests in turn.

1.

"State law controls the analysis of whether [an employee] has a property interest in his employment." *McDonald*, 102 F.3d at 155. In Texas, an at-will employment state, "employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). Therefore, to establish a property interest—"a legitimate right to continued employment"—an employee must show that the at-will presumption has

been altered. *McDonald*, 102 F.3d at 155; *see also Muncy v. City of Dall.*, 335 F.3d 394, 398 (5th Cir. 2003).

That presumption can be changed by "a specific agreement to the contrary." *Brown*, 965 S.W.2d at 502. To do so, "the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances. . . . An employee who has no formal agreement with his employer cannot construct one out of indefinite comments, encouragements, or assurances." *Id.*

Zeng signed an "Employment Acknowledgment" form that explicitly stated "a contract was not being offered" and "all employment at the Texas Tech University Health Sciences Center is employment-at-will." To establish a property interest, then, that status must have been modified. To that end, Zeng asserts that he and Wu formed a "definitive understanding" that he "would have continued employment." We disagree.

To support his position, Zeng asserts little more than conclusory statements that an understanding existed. He points first to two discussions with Wu regarding the stability of the position based on research-grant funding. He then speculates that Wu did not intend to fire him and, therefore, there was an understanding between the two. None of these instances "unequivocally indicate[s] a definite intent to be bound not to terminate the employee except under clearly specified circumstances." *Brown*, 965 S.W.2d at 502.

As an initial matter, the first set of conversations on which Zeng relies took place in the interview phase, i.e., *before* he signed the employment acknowledgment that expressly stated his employment was at-will. Those discussions could not have modified an employment arrangement that did not yet exist.

Irrespective of when the conversations occurred, Zeng can point to no

"expressed" or "clear and specific" agreement to modify his employment from at-will. *El Expreso, Inc. v. Zendejas*, 193 S.W.3d 590, 594 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (quotation omitted).  The best he can do is state that Wu told him there was sufficient funding to sustain the position for several years.  At most, Wu's statements regarding the stability of funding were "indefinite . . . assurances." *Brown*, 965 S.W.2d at 502.

Moreover, whether Wu intended to fire Zeng is irrelevant.  That a supervisor does not intend to fire an employee does not compel the conclusion that he or she is "bound not to terminate the employee . . . ." *Brown*, 965 S.W.2d at 502.  It shows only that the supervisor does not wish to do so, not that he or she could not do so if desired.

Zeng was hired as an at-will employee.  Nothing changed that.  He had no "legitimate right to continued employment" and, therefore, no protected Fourteenth Amendment property interest. *McDonald*, 102 F.3d at 155.

2.

Zeng asserts that his termination infringed on a liberty interest, which, like property interests, can trigger procedural due process rights.  When "the government discharges an employee amidst allegations of misconduct, the employee may have a procedural due process right to notice and an opportunity to clear his name." *Bledsoe*, 449 F.3d at 653.  Those rights are triggered "only when the employee is discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities." *Id.* (quotation omitted).

We employ a seven-element "stigma-plus-infringement" test to determine whether a government employee is entitled to a remedy under § 1983. *Id.*  Zeng must demonstrate that "(1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity

to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request." *Id.* He cannot do so.

To the extent that Zeng reasserts his argument made in the district court that Texas Tech infringed on his liberty interests by classifying his termination as for "misconduct," that claim fails here as it did there. It is undisputed that Zeng violated Texas Tech policy when he worked from West Virginia. He fails element three, then, because the "charges were [not] false." *Id.*

Zeng also claims that Texas Tech's determination to designate him as not eligible for rehire ("NEFR") was "both adverse and stigmatizing" and, therefore, infringed his liberty interest. That assertion fails for several reasons. The meaning of an NEFR designation is published in the Texas Tech University System regulations. There, it states the criteria for NEFR: "The individual engaged in behavior that constitutes serious misconduct including but not limited to fraud, theft, violence/threat of violence, alcohol/drug policy violation, moral turpitude, sexual misconduct, or other conduct demonstrating unfitness for employment." Because Zeng was fired for misconduct, he "engaged in . . . conduct demonstrating unfitness for employment," and it fails *Bledosoe*'s third element. *Id.*

Moreover, Zeng provides no evidence that the "the charges were made public." *Id.*[6] To be sure, the NEFR designation was disclosed to a reference-check company that was hired at Zeng's behest. But because "there is no liability when . . . the plaintiff cause[s] [the charges] to be made

---

[6] As described above, the meaning of an NEFR designation is publicly available. But Zeng's NEFR designation, not what that designation generally means, is what must have been "made public." *Bledsoe*, 449 F.3d at 653.

public," that is insufficient. *Hughes v. City of Garland*, 204 F.3d 223, 228 (5th Cir. 2000) (quotation omitted). Zeng can point to no other instances in which the NEFR designation was made public. Therefore, his assertion also fails *Bledsoe*'s fifth element. *Bledsoe*, 449 F.3d at 653.

Because Zeng did not have a property interest in continued employment, and because he cannot show that his termination infringed on a liberty interest, he was not deprived of any procedural due process rights. Therefore, we affirm summary judgment on his § 1983 claims.

## C.

Zeng puts forth defamation and tortious interference claims under Texas tort law. He posits that the individual defendants defamed him by labelling him as terminated for misconduct and NEFR. He further contends that those labels were communicated to prospective employers, committing tortious interference with prospective employment.

These claims border on frivolity. Substantively, Zeng cannot show that Texas Tech published a false statement, which is a required element of defamation. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). As explained above, the alleged defamatory statements were not false, nor did Texas Tech make them public. Neither can Zeng demonstrate that Texas Tech's actions were "independently tortious or unlawful," an element of a tortious interference claim. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). And, in any event, the claims are barred by sovereign immunity.

The Texas Tort Claims Act ("TTCA") provides a "limited waiver of [sovereign] immunity for certain suits." *Garcia*, 253 S.W.3d at 655. Recovery against a government employee is barred "when suit is filed against an employee whose conduct was within the scope of his or her employment and the suit could have been brought against the governmental unit." *Id.* at 657

No. 20-50210

(citing TEX. CIV. PRAC. & REM. CODE § 101.106(f)).  Thus, Zeng seeks to avoid sovereign immunity by claiming that defendants' conduct was not within the scope of their employment or was otherwise *ultra vires*.

To be within the scope of employment, there must be "a connection between the employee's job duties and the alleged tortious conduct." *Laverie v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017).  That connection may be satisfied "even if the employee performs negligently or is motivated by ulterior motives or personal animus so long as the conduct itself was pursuant to her job responsibilities." *Id.*  The district court found, and Zeng now seemingly concedes, that "there is a clear connection between the conduct at issue in [Zeng's] tort claims—essentially, how the Individual Defendants categorized and decided his termination—and the Individual Defendants' job duties as administrators of [his] workplace."  We agree.

"To fall within th[e] *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).  Acting "without legal authority" means that the government actor must have "violated statutory or constitutional provisions." *Lazarides v. Farris*, 367 S.W.3d 788, 800 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  Zeng alleges only violations of Texas Tech policy, not "statutory or constitutional provisions." *Id.*[7]  Therefore, that assertion is insuffi-

---

[7] We recognize that because Texas Tech is a state university, some of its policies—those promulgated by the Board of Regents—may "have the same force as an enactment of the legislature" for purposes of waiving sovereign immunity. *Hall v. McRaven*, 508 S.W.3d 232, 235 (Tex. 2017).  But not every university policy meets that criterion. *See Univ. of Hous. v. Barth*, 403 S.W.3d 851, 856 (Tex. 2013).  Because Zeng provides "no evidence that the [relevant policy was] enacted by the Board of Regents," those policies are not "law" for purposes of the *ultra vires* or purely-ministerial-act exceptions to sovereign

cient to sustain a claim under the *ultra vires* exception.

Purely "[m]inisterial acts are those where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015) (quotation omitted). Again, Zeng asserts only duties imposed by Texas Tech policy, not law. Therefore, he can demonstrate no failure to perform purely ministerial acts on behalf of the defendants.

In sum, Zeng's tort claims are barred by sovereign immunity under the TTCA. Even if they weren't, his substantive arguments lack merit. We affirm the summary judgment in favor of the individual defendants on the tort claims.

## D.

Zeng appeals the denial of his motion for supplemental discovery. Rule 56(d) of the Federal Rules of Civil Procedure states that, following a motion for summary judgment, if the nonmoving party "shows . . . that, for specified reasons, it cannot present facts essential to justify its opposition, the court may" permit additional discovery. FED. R. CIV. P. 56(d). "We review a district court's denial of a Rule 56(d) motion for abuse of discretion." *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (per curiam). We find none.

Motions for additional discovery under Rule 56(d) are "broadly favored and should be liberally granted because the rule is designed to safeguard nonmoving parties from summary judgment motions that they cannot

---

immunity. *Id.* at 855–57.

adequately oppose." *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) (quotation omitted). Even still, the nonmoving party must demonstrate "how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Biles*, 714 F.3d at 894 (quotation omitted). Therefore, "we generally assess whether the evidence requested would affect the outcome of a summary judgment motion." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 423 (5th Cir. 2016).

Zeng sought to discover Montoya's and Lopez's "timesheets and the records of [their] access card use" for an additional period of time. According to Zeng, "[i]n order to assess the seriousness" of their violations for the purposes of establishing that he was similarly situated to them, it was "important to know how many claimed workdays without access card use" they had accrued.[8] As explained above, however, the number of claimed workdays without access card use—even if equal to or greater than Zeng's 119-day absence—would not make Montoya or Lopez similarly situated to him. The violations themselves are different. One is the improper use of an access badge; the other is working from another part of the country without proper authorization.

Because the additional discovery would not have "affect[ed] the outcome of [the] summary judgment motion," the district court did not abuse its discretion in denying the motion. *Id.*

## E.

Zeng appeals the denial of his motion for sanctions for spoliation of

---

[8] On appeal, Zeng recharacterizes the aims of his motion. He now intimates that additional discovery may somehow have uncovered that Montoya and Lopez were not working at all, rather than only failing to use their access badges. Because the additional discovery that Zeng sought would not have uncovered that information, we need not address its relevance.

evidence. He asserts that Texas Tech deleted his work email account history in violation of its duty to preserve evidence. The district court determined that the motion failed because Zeng could not make the requisite showing of bad faith. We review that decision for abuse of discretion. *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015). Once again, we find none.

"Spoliation of evidence is the destruction or the significant and meaningful alteration of evidence." *Id.* (quotation omitted). When that occurs, we permit an "adverse inference" against the offending party "only upon a showing of 'bad faith' or 'bad conduct.'" *Id.* (quoting *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005)). The duty to preserve evidence attaches only "when the party has notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant." *Id.*

It is uncontested that the emails were deleted on March 3, 2018.[9] The only evidence Zeng posits may have placed Texas Tech on notice of the litigation before that date is a complaint sent to Rotwein and an exchange of emails with Salcido and Lange. Zeng sent Rotwein a letter expressing his regret that he had been terminated, explaining the stain the termination would have on his "career record," stating that the decision would "reflect poorly on the university," and asking Rotwein to reconsider. He then forwarded that letter to Rebecca Salcido and Lange.

Nothing in that letter could be construed as placing Texas Tech on notice that Zeng would even file suit, much less that his emails would be relevant to that litigation. Never was there a mention of discrimination or

---

[9] It appears that the emails were deleted per a general Texas Tech policy, under which emails are deleted ninety days after an employee is terminated. That factual assertion was uncontested until Zeng now claims that "no such policy was produced." Even if there was no policy in place, both sides agree that the emails were deleted on March 3.

No. 20-50210

procedural failures, nor the slightest intimation of further action. The district court did not abuse its discretion when it determined that Texas Tech did not act in bad faith when it deleted Zeng's emails.

*     *     *

Zeng broke the rules, his employer found out, and he got fired. That may be disappointing to him, but that doesn't make it illegal. The summary judgment is AFFIRMED.